**FEDERAL DEPOSIT INSURANCE COR-PORATION, Plaintiff,**

v.

**IRVING TRUST COMPANY, Defendant.**

**FEDERAL DEPOSIT INSURANCE COR-PORATION, Plaintiff,**

v.

**GUARANTY TRUST COMPANY OF NEW YORK, Defendant.**

United States District Court
S. D. New York.
Dec. 15, 1955.

Judd & Gurfein, New York City, Wyatt, Grafton & Grafton, Louisville, Ky., Royal L. Coburn, General Counsel, Federal Deposit Insurance Corp., Washington, D. C., Orrin G. Judd, New York City, Wilson W. Wyatt, Louisville, Ky., G. J. Oppegard, Asst. General Counsel, F.D.I.C., Washington, D. C., Charles E. McGuinness, New York City, Edgar A. Zingman, Louisville, Ky., of counsel, for plaintiff.

Davis Polk Wardwell Sunderland & Kiendl, New York City, Theodore Kiendl, Stephen G. Kent, Charles H. Willard, Henry L. King, New York City, of counsel, for defendants.

McGOHEY, District Judge.

These actions, brought under the deposit insurance laws of the United States, involve common questions of law and fact and were consolidated for trial. They seek judgments: 1. declaring that certain funds received and held by each defendant constitute deposits as that term has been defined by statute and regulations made pursuant thereto; 2. directing that each defendant file amended certified statements which shall include the balances of such funds in the "assessment base" for each semi-annual period up to date, beginning with the period for which the certified statements were due on July 15, 1945; 3. for the amount of deposit insurance assessments found to be due from each defendant upon such amended certified statements, plus interest and costs.

Federal Deposit Insurance Corporation, hereafter called FDIC, is a governmental corporation created by the Banking Act of 1933 which inaugurated, on an experimental basis, the Federal Government's first venture in the insurance of bank deposits.[1] The defendants, hereafter called respectively Guaranty and Irving, are banking corporations chartered and operating under the laws of New York. Since January 1, 1934, each has been an "insured bank" and a member of the Federal Reserve System. The Court has jurisdiction of the parties and subject matter. The actions which were tried to the Court alone arise out of the following circumstances.

The Banking Act of 1933 did not define "deposit." It authorized FDIC to raise capital through the sale of its stock to member banks of the Federal Reserve System, which were required to purchase it in amounts based on their respective totals of "deposit liabilities as computed in accordance with regulations prescribed by the Federal Reserve Board." It further provided that on and after July 1, 1934, no state bank, trust company or mutual savings bank could become a member of the Federal Reserve System until it became a stockholder of FDIC; and no national bank could secure authorization from the Comptroller of the Currency to commence business until it became a member of the Federal Reserve System and a stockholder of FDIC. There was then in effect a Federal Reserve Board ruling promulgated in 1922[2] " * * * that all funds received by a bank in the course of its commercial business must be treated either as deposits against which reserves must be carried, or as trust funds, subject to the ordinary restrictions and safeguards imposed upon the custody and use of trust funds, [and] that whether a certain deposit falls in one category or the other must depend in each case upon the particular terms and conditions under which it was made."

After more than a year's study of the experiment in practical operation and after extensive Congressional hearings, the permanent system of federal deposit insurance was established by The Banking Act of 1935.[3] In that Act Congress defined "deposit" and required each insured bank to file with FDIC semi-annually a certified statement of its total liability for deposits as so defined and to pay to FDIC an assessment computed at the annual rate of one-twelfth of 1% of the certified total which is called "the assessment base." The definition of "deposit" was as follows:

"The term 'deposit' means the unpaid balance of money or its equivalent received by a bank in the usual course of business and for which it has given or is obligated to give credit to a commercial, checking, savings, time or thrift account, or which is evidenced by its certificate of deposit, and trust funds held by such bank whether retained or deposited in any department of such bank or deposited in another bank, together with such other obligations of a bank as the board of directors shall find and shall prescribe by its regulations to be deposit liabilities by general usage: * * * *"

Regulation I, promulgated by FDIC,[4] provided that

"the term deposit shall include the following obligations:

"(a) *Outstanding drafts, cashier's checks, and other officer's checks.* Outstanding drafts *, cashier's checks, and other officer's checks issued under any of the following circumstances:

"(1) For money or its equivalent received by the issuing bank; or

---

1. 48 Stat. 168. This added a new section, 12B, to the Federal Reserve Act, 12 U.S.C.A. § 264.

2. 1922 Fed.Res.Bull. 572.

3. 49 Stat. 684. This amended § 12B of the Federal Reserve Act.

4. 12 C.F.R. 301.1 (1939 Edition).

"(2) For a charge against a deposit account in the issuing bank; or

"(3) In settlement of checks, drafts, or other instruments forwarded to the issuing bank for collection.

"(b) *Certified checks.* Checks drawn against a deposit account and certified by the drawee bank.

"(c) *Traveler's checks and letters of credit.* Outstanding traveler's checks or letters of credit on which the bank is primarily liable issued under either of the following circumstances:

"(1) For money or its equivalent received by the issuing bank; or

"(2) For a charge against a deposit account in the issuing bank; or

"(d) *Money or its equivalent.* Under paragraphs (a) and (c) of this section, drafts, cashier's checks, and other officer's checks, traveler's checks and letters of credit must be regarded as issued for the equivalent of money when issued in exchange for checks or drafts or for promissory notes upon which the person procuring any of the enumerated instruments is primarily or secondarily liable."

"* Drafts drawn on foreign correspondents or foreign branches and payable only in foreign countries are not included in the term 'deposit'."

In 1946 FDIC commenced its first audits of insured banks. By the end of 1949, several hundred of the larger insured banks in the country had been examined. The audits showed that while many of the banks which had accounts containing funds of the kind here in dispute had, in their certified statements to FDIC since 1935, included the balances of those accounts in their assessment bases and had paid the required assessments thereon, about 85 of the largest banks, including the defendants, had not. Early in 1950, FDIC made demand on all insured banks which had such accounts but had not so certified and paid, to file amended certified statements which would include such balances in their assessment bases and to pay the proper assessments thereon. Every bank on which this demand was made complied, except Guaranty and Irving.

In September, 1950, after extended hearings by respective committees of the Senate and the House, The Federal Deposit Insurance Act became law.[5] It will hereafter be referred to as the 1950 Act. In it Congress retained all of the 1935 Act's definitions, including the definition of "deposit" and added the following: "The term 'trust funds' means funds held by an insured bank in a fiduciary capacity and includes, without being limited to, funds held as trustee, executor, administrator, guardian or agent."[6] Several amendments were made to the section of the 1935 Act relating to assessments, but only one is important here. It provides[7] that in computing its total liability for "deposits" an insured bank "may exclude from its assessment base * * * cash funds which are received and held solely for the purpose of securing a liability to the bank but not in an amount in excess of such liability, and which are not subject to withdrawal by the obligor and are carried in a special non-interest-bearing account designated to properly show their purpose." The 1950 Act also prohibited suits for recovery of assessments claimed to be due and unpaid "for any year prior to 1945."[8]

After passage of the 1950 Act, FDIC revised Regulation I by substituting for

---

5. 64 Stat. 873. By this statute § 12B of The Federal Reserve Act was withdrawn from that Act, made a separate Act to be known as the "Federal Deposit Insurance Act". 12 U.S.C.A. § 1811 et seq. and amended.

6. 12 U.S.C.A. § 1813(p).

7. 12 U.S.C.A. § 1817(a) (2) (ii).

8. 12 U.S.C.A. § 1817(g).

the above quoted subdivision (d), the following: [9]

"(d) *Special purpose funds.* Money received or held by the bank, or the credit given therefor to an account including a special or memorandum account, which money or credit is held for a special or specific purpose, regardless of whether the relationship thereby created is that of debtor-creditor, fiduciary, or any other relationship.[2]

"2. Special purpose funds, defined in Sec. 326.1(d), include, among others and without limitation to those mentioned here, escrow funds, funds held as collateral security for an obligation due the bank or others, withheld taxes, funds held for distribution or for purchases of securities or currency, or funds held by the bank to meet its acceptances or letters of credit. The Corporation has consistently interpreted the term 'deposit', as defined in the Federal Deposit Insurance Act since 1935, to include special purpose funds as defined in Sec. 326.1(d). These special purpose funds are also deposits by general usage. This clarification is made with the realization that some or all of the funds defined as special purpose funds in Sec. 326.1(d) may be within the term 'deposit' as defined in the Federal Deposit Insurance Act since 1935."

The several types of funds sued on are itemized in Paragraph IX of each complaint. At the trial items 1, 5, 6, 10(in part), 11, 12 and 14 of Paragraph IX of the complaint against Irving were characterized by its counsel as "very small and inconsequential" and he made "an unconditional withdrawal" of Irving's "contest" as to those items. He added "we are not contesting [them] but we are not admitting liability." Guaranty contested all of the items set out in the complaint against it.

There remain in dispute funds found in fourteen types of accounts which will hereafter be described and designated A through N. Accounts A through D and G, J and K are carried by both defendants. Account L is carried by Guaranty only. Accounts E, F, H, I, M and N are carried by Irving only.

The funds in each of the fourteen accounts are received by the banks in the regular course of business. They are commingled with and invested in the same way as all other bank funds including those conceded to be deposits within the statutory definition. As will later appear, accounts A through F, H and I which are called "cash collateral accounts," and account G which is called "anticipated acceptances account," are carried as "special non-interest-bearing account[s] designated to properly show their purpose." Absent a customer's default in his obligation to the bank, the funds in the cash collateral accounts, except account A, are not subject to appropriation by the bank and are withdrawable by the customer when his obligation to the bank has been discharged without recourse to his cash collateral. However, as long as the customer's obligation to the bank remains undischarged, they may not be withdrawn except to a limited extent from account B. The funds in account A, which is called "cash collateral for commercial letters of credit," are used by the banks to pay drafts presented by the beneficiaries. The funds in account G are used by the banks to pay drafts presented by holders of the banks' acceptances. After all such payments have been made, any balance then remaining in accounts A and G may be withdrawn by the customer. Customers are kept informed as to the status of the accounts carried in their names, either by statements showing monthly transactions and balances or by separate written advices as to each transaction as it is recorded in the account.

9. 12 C.F.R. 326.1(d). The text of the former subdivision (d) of Regulation I was retained in a separately numbered paragraph; 12 C.F.R. 326.2.

The balances in all the accounts, except account G, are included in the total of deposits shown in reports, later published, which under substantially identical regulations promulgated by the Federal Reserve Bank and the New York State Banking Department, the defendants are required to file with those agencies. They are also included in the total of deposits shown in "condensed statements of condition" which the defendants voluntarily publish and circulate to stockholders, customers and the public.

FDIC makes two claims. The first is that the funds in each of the fourteen accounts constitute deposits under the statutory definition and therefore the balances of all the accounts are assessable and should have been included in the assessment bases. The second is that the funds in the cash collateral and anticipated acceptances accounts were not and are not "received and held solely for the purpose of securing a liability to the bank" and hence, under the 1950 Act, no part of the balances of those accounts may be excluded from the defendants' assessment bases.

The defendants concede they have never included in their assessment bases the balances of accounts A through G except when as sometimes happened in account C, the balance exceeded the customer's "total liability" to the bank. They concede that such excess "of course is no longer cash collateral" and assert that though it was retained in the account, it was always included in the certified assessment bases. They assert further that there is never an excess in any of the other cash collateral accounts. As to the concession they make two contentions. The first is that any of the funds in accounts A through G which were not included in the assessment bases did not constitute deposits under the statutory definition and hence were not assessable. The second is that such funds were and are "received and held solely for the purpose of securing a liability to the bank" and therefore after the passage of the 1950 Act, the exclusion from the assessment base of the balances in accounts A through G was proper.

The defendants also concede that the balances of accounts H through N were never included in the assessment bases prior to January 15, 1951, when the first certified statements due after passage of the 1950 Act were filed. Although on and since that date these balances have been included in the assessment bases, the defendants contend they have done this only because the amounts involved were comparatively small and because they desired "to be on all fours with FDIC." They "did not and do not concede" that the funds in those accounts "were or are assessable deposits" either "in fact or in law."

Obviously, the first issue to be determined is whether any of the funds in dispute constitute deposits within the statutory definition. Then, if the funds in accounts A through G or any of them are held to come within that definition, there will remain the further issue whether the portion of those funds not in excess of customers' liability to the banks was "received and held solely for the purpose of securing a liability to the bank."

In connection with the second issue it is to be noted that not only Guaranty and Irving but also all other insured banks which carry accounts A through G have, since the passage of the 1950 Act, excluded the balances of such accounts from their assessment bases.

Counsel have not cited nor has the Court discovered any case in which these precise issues were considered or determined.

The facts heretofore and hereafter stated constitute the Court's findings. On those findings and for the reasons which will later be set forth, I hold, on the first issue, that all of the disputed funds constitute deposits within the statutory definition. From this it follows and I so hold that, in the certified statements filed by the defendants on July 15, 1945 and thereafter up to and including July 15, 1950, the balances of accounts

A through N should have been included in the assessment bases and the proper assessments thereon should have been paid.

■ On the second issue I hold that, the funds in accounts A through G not in excess of the customers' liability to the banks, were and are "received and held" by the latter "solely for the purpose of securing [such] liability." From this it follows and I so hold that, since the passage of the 1950 Act it was and is lawful for the defendants to exclude from their assessment bases the balances of accounts A through G not in excess of the customers' liability.

Accordingly, the defendants will be required to file amended certified statements and to pay the additional assessments found to be due thereon, only for the period commencing January 15, 1945 and ending July 15, 1950.

The several typical accounts, the purposes for which they are established and the manner in which they are administered are as follows:

A. Cash collateral received by the banks and held pending payment against irrevocable commercial letters of credit (G. IX–6 & 7; Ir. IX–2);[10] or in the alternative, the Letters of Credit themselves (G. IX–8; Ir. IX–2a).

A foreign bank acting for its customer asks the defendant bank to confirm an irrevocable letter of credit to an American beneficiary under the terms of which the defendant bank agrees under the stated conditions to honor drafts drawn by the beneficiary. Under the letter of credit agreement, the foreign bank is obligated to reimburse the defendant bank for all drafts paid under the letter of credit. This obligation is secured by a lien on the title documents which must be presented by the beneficiary. The defendant bank usually does not require additional security in the form of cash from a good credit risk but charges a confirmation commission. The commis-

sion is waived, however, in instances where the defendant bank requires cash or where it is voluntarily supplied. In such cases the cash is usually provided from funds in an account of the foreign bank currently held by the defendant bank. The latter account, which the defendants concede to be a "deposit" account and thus assessable, is charged the necessary amount which in turn is credited to and carried in a "Cash Collateral Account" in the foreign bank's name. Payments of drafts presented by the beneficiary are charged against the latter account. After the defendant bank has discharged its commitment under the letter of credit, any unused balance in the "Cash Collateral Account" is charged out of the latter and credited to the "deposit" account of the foreign bank. Likewise if the letter of credit be entirely cancelled, the entire amount in the "Cash Collateral Account" is charged out and credited to the "deposit" account.

B. Cash proceeds from sale of securities held as collateral to a loan (G. IX–1 and 4; Ir. IX–3a).

A borrower pledges marketable securities as collateral to a loan. Under the loan agreement the borrower may trade in the pledged securities and direct the bank to deliver specified securities to a broker upon receipt of payment. The cash thus received is credited to a "Margin" or "Cash Collateral" account in the name of the borrower and at the latter's direction may be applied in reduction of the loan or used to purchase new securities acceptable to the bank to replace those sold. Any balance in the account over and above what may be required to keep the loan fully collateralized may, at the borrower's direction, be transferred to his regular checking account or withdrawn from the bank.

C. Cash proceeds from sale of commodity dealers' securities and cash collateral to commodity dealer's loans (G. IX–2; Ir. IX–3c).

10. Matter in parentheses indicates item numbers used in Paragraph IX of the respective complaints.

Loans or advances are made to a dealer in commodities under a continuing loan agreement secured by the commodities. The funds thus provided are carried in an "Advance Account" in the dealer's name against which the dealer may draw by check. Repayment is made by crediting to the "Advance Account" the proceeds of sales of the underlying commodities and by deposits of other funds. It sometimes happens that the total thus credited to the "Advance Account" exceeds the amount advanced, and results in a credit balance standing in the dealer's name. The dealer may then have other outstanding obligations to the bank, such as time or demand loans, also secured by commodities or other collateral. If the dealer has such other obligations the credit balance in the "Advance Account" is then held there allegedly as "substituted collateral" for them. There was no evidence to show that the liens on the underlying commodities are thereupon released but it will be assumed that they are. It is only when and if this credit balance exceeds all of the dealer's obligations, of whatever kind, to the bank that the excess is reported as an assessable deposit.

Some dealers are required to furnish cash in addition to commodities as security for advances. This is done by maintaining "fixed deposits" in "Margin" or "Cash Collateral" accounts standing in the dealers' names. In some of these accounts very large amounts of cash have been carried unchanged for a long period of years.

D. Cash collateral for Guarantees and other liabilities to third persons (G. IX–10; Ir. IX–4).

This category embraces similar accounts which are used in five types of transactions:

1. Letters of credit issued in connection with international triptyques of the American Automobile Association.

A triptyque is a document issued by AAA to persons taking an automobile into foreign countries. It is an engagement by AAA to pay customs charges incurred by the owners. AAA requires a deposit of $2,000 but will accept in lieu thereof a letter of credit issued by an American bank authorizing AAA to draw drafts to reimburse it for payments made under the triptyque. Upon issuing such a letter of credit the bank charges the amount to the customer's regular account and credits it to a "special account" in the customer's name. Drafts by AAA are charged to the special account. If no such drafts are made and the letter of credit is returned unused, the amount in the special account is then credited back to the customer's regular account.

2. Cash margin in connection with foreign financial transactions.

A foreign customer authorizes a debit against its general account to be credited to a "special margin account" in its name in order to induce the bank to extend credit by way of overdraft and to protect the bank in case of the customer's default. The funds are held in this special account during the life of the arrangement.

3. Cash margin in connection with foreign exchange contracts.

A customer directs the bank to sell for his account foreign exchange, usually Sterling, for future delivery. To protect itself against a rising market should the customer fail to furnish the Sterling prior to the delivery date, thus necessitating purchase by the bank in the open market, a debit of the necessary amount is made to the customer's general account and a corresponding credit is made to a "foreign margin account" in the customer's name. If the contingency occurs any expense to the bank is charged not against the "foreign margin account" but against the customer's general account. When the transaction is completed, the funds in the margin account are returned to the customer's general account.

4. Cash margin in connection with guarantees.

The bank, on behalf of a customer, issues its guarantee in favor of third persons. Funds to reimburse the bank for any payments made under the guarantee are charged to the customer's general account and credited to a "margin account" in his name. The funds are held in the latter account during the life of the agreement of guaranty. They are thereupon returned to the customer's general account.

5. Cash margin in connection with consignment of traveler's letters of credit.

The bank consigns its letters of credit forms to correspondent banks which issue the letters to their customers. Since these letters represent an undertaking of the defendant bank, the correspondents are sometimes required to supply funds as security against the defendant bank's risk. These funds are maintained in a "margin account" in the name of the correspondent until the defendant bank is fully reimbursed.

E. Cash collateral against securities purchased, where the bank itself places the order with the broker (Ir. IX–10).

Irving at a customer's direction places with a broker or dealer an order to buy securities specified by the customer and is advised when delivery will be made. Under the rules of the Stock Exchange the bank, though acting for a disclosed principal, becomes liable to the broker or dealer. On the date fixed for delivery, the bank debits the customer's regular account the necessary amount and credits this to a special account in the customer's name denominated "Other Demand Deposits—Cash Collateral," where the funds remain until paid out for the securities when actually delivered. This may occur on the date first specified but it frequently happens that delivery is not made until several days later.

F. Cash collateral in connection with F. H. A. building loans (Ir. IX–13).

Irving makes construction loans secured by FHA-insured mortgages on large scale housing projects. The borrower is required by FHA to place with Irving certain sums (a) as "completion collateral" to assure that necessary onsite facilities are provided; (b) as "offsite collateral" to assure adequate offsite facilities; (c) as "working capital collateral" to assure sufficient funds for one year's operation after construction is completed. These funds are credited to and held during the required period in a special account in the name of the mortgaged premises so as to be available to pay the above items if the borrower does not. They are returned to the borrower upon proof of satisfactory discharge of the items.

G. Anticipated acceptances (G. IX–9; Ir. IX–17).

When a bank agrees to accept a time draft for its customer the latter agrees to put the bank in funds one day prior to maturity. The bank then issues its acceptance by which it obligates itself to pay the holder thereof at maturity. The bank then enters the amount in an account in the customer's name and denominated "Customer's Liability under Acceptances." In the same account, there is entered as an offset the amount of covering funds when received from the customer. Frequently these are received well in advance of one day before maturity and are held in the account until paid out on the draft.

H. Cash proceeds of loans for prepayment of Life Insurance premiums (Ir. IX–3b).

A customer desiring to finance the prepayment of life insurance premiums for a number of years, usually five, borrows the needed amount on notes discounted in advance at 2%. At the same time he pledges to the bank the cash surrender value of the policies and the refundable value of unearned prepayments. The proceeds of the loan are left with the bank which, under agreement with the borrower, undertakes on his behalf to transmit the premium payments to the insurance company. The bank assumes no obligation to the lat-

ter. If, as frequently happens, the insurance company declines to accept all the prepayments offered, the unexpended balance of the loan is retained by the bank as "additional" collateral to the loan and is carried in a special cash collateral account in the borrower's name. Out of the funds in this account the bank pays future premiums, as they become due. The borrower is required to keep the collateral equal to the full amount of the loan at all times. Accordingly, since each annual premium paid out of the cash collateral account exceeds the contemporaneous increase in the policy's cash surrender value, and the total collateral is thereby depleted by the amount of that excess, the borrower is required to make good the depletions with additional cash which the bank credits to his cash collateral account.

I. Cash received under charter party agreements pledged as security for loans (Ir. IX-8).

Irving makes loans to shipowners on a series of 90 day notes secured by ship's mortgages and assignments of the charter hire which is used to pay principal and interest on the notes as they become due quarterly. The hire is received by the bank at the end of each voyage, of which there are usually two or perhaps three in each month. These funds as received are credited to the borrower's regular account and simultaneously charged out in satisfaction of any quarterly payments then due or, if nothing is then due, to a cash collateral account in the borrower's name where they are accumulated to meet quarterly payments subsequently due.

J. Taxes withheld (G. IX-3; Ir. IX-16).

Withheld Income and Social Security taxes and taxes on the dividends and interest on securities, payable by the bank as agent for the issuing corporations, are credited as withheld to special accounts denominated "Accounts payable—taxes withheld." They are held in these accounts until paid over to the appropriate taxing authority.

K. Unclaimed Dividends (G. IX-5; Ir. IX-9).

When stocks held by the banks or their nominees as custodian or pledgee are sold by the true owner, transfer to the name of the purchaser is often delayed with the result that dividends continue to be paid to the bank. Where the new owner is unknown these funds are carried in accounts variously entitled "Accounts Payable—Unclaimed Dividends" and "Other Demand Deposits—Deferred Items—Dividends." When the new owner makes proof of his claim the dividends are paid over to him. If they remain unclaimed for the statutory period they are turned over to the State of New York pursuant to its Abandoned Property Law.

L. Treasurers' and Officers' Checks (G. IX-11).

Guaranty's foreign branches maintain dollar accounts with the Home Office. At the direction of the foreign branch the Home Office issues its treasurer's checks to make payments on behalf of customers of the foreign branch to individuals or corporations in the United States and charges the payments to the dollar account of the foreign branch.

M. Funds held pending distribution to co-lenders (Ir. IX-7).

Irving makes loans in cooperation with co-lenders and, under the governing agreements, receives payments of interest and principal on behalf of the group. On some loans distribution of payments is not required to be made immediately upon their receipt, but only at quarterly intervals. In these instances the funds received are carried, until distributed, in an account denominated "Other Demand Deposits—Deferred Items." Such funds are sometimes so held for as long as three months before distribution.

N. Prepayments of Interest on Commercial Loans (Ir. IX-15).

Occasionally borrowers from Irving, in order to insure against possible default through oversight or absence from the City, anticipate interest on their

loans in situations of which the following are typical. When a 90 day note which was discounted in advance is to be renewed, the new 90 day note is delivered to the bank before maturity of the first note together with full cash payment of interest on the renewal note. When a note on which interest is not due until maturity is to be renewed, the new note is delivered to the bank before maturity of the first, together with full cash payment of the interest which will be due on the original note at its maturity. When interest on a one year note is payable quarterly, installments are paid in cash in advance. Such prepayments are credited to specially designated accounts, where they are carried until the date when payment to the bank is due.

It would seem to be clear from the findings as to the disputed funds and the accounts in which they appear that the balance in each of the accounts, except L which will be considered later, is literally the "unpaid balance of money * * * received by a bank in the usual course of business and for which it has given or is obligated to give credit to a commercial, * * * account." The defendants do not dispute that the balances consist of "money which is received by the banks in the usual course of their commercial banking business." They contend, however, (1) that in the first part of the statutory definition just quoted, Congress intended to describe merely what the defendants call an "ordinary deposit"; a term they further define as "a form of contract liability, having special indicia of its own, the most important of which are that it is currently available on demand or on the giving of a specified term of notice or at a specified time, that it is made for the convenience of the depositor, and that it is essentially for safekeeping"; (2) that the funds found in each of the accounts, and especially in the cash collateral accounts (A through F, H and I) "do not have any of the indicia of an ordinary deposit." Both of these contentions are rejected. The Court may not rewrite the statute by substituting the defendants' definition of "deposit" for the one which Congress enacted. If Congress had intended to insure only those funds which are entrusted to a bank merely to be "currently available," for the owner's "convenience" and "essentially for safekeeping," there is no possible reason for supposing that it would have omitted such significant limitations from the statutory definition or that it lacked the skill to devise a form of words which would clearly express such intention. The records of the Congressional hearings on the 1935 Act do not support the defendants' thesis.[11] Those records disclose that the definition of deposit as enacted, was in substance the one recommended by FDIC's officials who had administered the temporary system for more than a year, during which they had had extensive communication with members of Congress, bankers and others concerned with the banking business. Judge Birdzell, Counsel to FDIC, pointed out that the Reserve Board definition of deposits against which reserves must be carried, which under the 1933 Act FDIC was required to follow, was in some respects unsatisfactory for deposit insurance purposes.[12] He said, by way of example, that a bank's check issued to pay off a depositor ought to be considered a "deposit liability upon the closing of a bank and also for purposes of assessment," but that a bank's check issued to pay its rent should not. It was impractical, he said, to provide in a statute for all the possible factors and varieties of circumstances which might have to be considered in determining whether or not a particular item was a "deposit liability" for insur-

---

11. Hearings-Subcommittee of the Committee on Banking and Currency United States Senate, 74 Cong. 1 Sess. Hearings-House Committee on Banking and Currency on H.R. 5357, 74 Cong. 1 Sess. Hereafter cited respectively as 1935 Senate Hearings and 1935 House Hearings.

12. 1935 House Hearings p. 55.

ance purposes, and therefore the Board of Directors of FDIC ought to have some leeway under the law to make regulations governing such particular determinations. Accordingly, on behalf of FDIC, he recommended the definition of deposits which, with modifications not pertinent to this point, Congress adopted. He certainly did not suggest such limitations as are found in the defendants' definition. Many leading bankers and representatives of the American Bankers Association and like organizations attended the hearings and testified. And it has already been noted that there had been conferences between leading bankers and officials of FDIC throughout the experimental period. The records show that, as Mr. Crowley, Chairman of FDIC, pointed out, officials of many large strong banks believed that depositors in their institutions did not need insurance; and they were of the opinion that those banks ought not be required to share the cost of insuring deposits in small weak banks in which, it may be assumed, most of the accounts consist of "ordinary deposits" as defined by the defendants. This opinion, as we know, did not prevail. Congress, on the contrary, seems to have shared Mr. Crowley's opinion. "All banks," he said, "large and small, should be required to support the insurance system. Banking is no longer merely a private business proposition. It involves great social consequences. The stability of the banking system affects the economic prosperity of the country. The raising of a sufficient revenue, solely through the levying of premiums against the deposits of those receiving direct insurance benefits will not be a fair distribution of the burden." [13] There is nothing in the records of the hearings to show that any official of FDIC or any member of the Senate or House even suggested such a

limited definition of deposits as the defendants', either to the committees that considered the 1935 Act or, what is perhaps more significant, later, to the committees that considered its revision in 1950.[14] Indeed it is particularly significant that neither these defendants nor any of the large insured banks from which amended certified statements were demanded and received by FDIC following the audits, challenged FDIC's interpretation of the statutory definition at the 1950 hearings or requested its amendment. The demands on Guaranty and Irving were delivered respectively on March 9 and May 9, 1950. The House hearings began June 20 and continued for three days.

The claims the defendants most strenuously contest are those which relate to the cash collateral accounts and particularly account A. Thus they assert that, if the funds in these accounts are held to be assessable deposits, the amount which both defendants will be required to pay on them alone, for the period January 15, 1945, to July 15, 1950, will be about $217,000, of which $193,000 will be assessed against the balances in account A. Accordingly, they make six special contentions as to the cash collateral accounts. These contentions are also rejected for reasons which follow.

The first contention is that the balances in the cash collateral accounts are not "unpaid balances." The supporting argument consists of three propositions: (a) "There is no *unpaid balance* in a cash collateral account, simply because there is no one to whom the cash collateral is payable, except the defendant banks themselves;" (b) "the funds are not withdrawable and are in the sole control of the bank"; (c) "there is no 'depositor' who can create a run on a bank for these funds." Proposition (a) is quite incorrect. Obviously the funds

---

13. House Hearings 1935, p. 10.

14. Hearings before Subcommittee of Senate Committee on Banking and Currency, entitled "Amendments to Federal Deposit Insurance Act" 81 Cong. 2 Sess.; here-

after cited as 1950 Senate Hearings. Hearings before House Committee on Banking and Currency, entitled "Amendments to Federal Deposit Insurance Act 1950" 81 Cong. 2 Sess.; hereafter cited as 1950 House Hearings.

in each account are "payable" to someone. That someone, it is true, may turn out to be the bank itself if a borrower defaults on a loan as collateral to which the funds were delivered to the bank. But it must be assumed that in practice that someone usually is the borrower himself, upon repayment of the loan. Responsible bankers, as a general rule, do not make loans to known defaulters. In the commercial letter of credit transaction the findings show that the funds in account A are not "payable" to the bank. On the contrary, they are "payable" only to either the beneficiary or to the bank's customer. The same is true of the funds in account G—"anticipated acceptances." To this the defendants reply that the beneficiary of a commercial letter of credit does not know, has no interest in knowing and has 'no right to be informed that the funds out of which his drafts are paid have been supplied in the first instance by the purchaser of the letter of credit. This is probably true also of a holder of an acceptance. But in either case it is quite immaterial. While such funds remain in the accounts pending the presentation, approval and payment of the drafts, they certainly constitute an "unpaid balance" of money under the statutory definition. Proposition (b) is based in part on the "ordinary deposit" thesis. Moreover it assumes without any foundation in the statute or legislative history that, though not therein expressed, there is incorporated in the definition of deposit as enacted in 1935, a factor which Congress did not even prescribe until 1950 and then only for use in determining what kinds of "deposits" might thereafter be excluded by a bank in computing its assessment base. The defendants' theory here seems to be that the 1950 Act's exclusion provision which permits a bank to exclude from its assessment base "cash funds which" among other characteristics, "are not subject to withdrawal by the obligor," is a sort of legislative exegesis in the light of which there are removed from the category of "deposits," even in the period between 1935 and 1950, all cash funds which have that characteristic. The defendants do not indeed in terms contend that the exclusion provision effected a formal amendment of the definition of deposit. That it obviously did not do. But they strongly urge, as later consideration of their fourth contention will reveal, that the "not subject to withdrawal * * *" specification in the exclusion provision enacted in 1950 must be taken to indicate what types of funds Congress, in 1935, intended to insure and assess. I do not agree. Proposition (c) is bottomed on the "ordinary deposit" thesis and also on a view of the purpose of deposit insurance which to me seems much too limited. This also will be considered in connection with the defendants' fourth contention.

The second contention is that the banks do not give and are not obligated to give, "credit" to cash collateral accounts. The defendants call it a "demonstrable fallacy" to say that the banks give "credit" to those accounts or to the anticipated acceptances accounts. With all respect, it seems that the fallacy lies rather in the following supporting argument: "What the statutory definition means by the word 'credit' * * * is that the 'credit' of a bank is the willingness of its customers to accept the bank as a *debtor*. That is what every deposit or does. But in the cash collateral situation, the basic fact is that the customer is not accepting the bank as a debtor, he is asking the bank to become his creditor, as by the making of a loan, the issuance of a commercial letter of credit, and the like. The cash collateral is subordinate and incidental, and has the sole purpose of securing the customer's liability as debtor to the bank. The bank is not the debtor of the customer with regard to the cash collateral, so long as the customer's obligation to the bank remains undischarged. The moment it is discharged, the funds cease to be cash collateral and if they are retained by the bank, become an ordinary assessable deposit." It is of course true that collateral, whether it be cash, securities or some

other thing of value, has the purpose of securing the customer's promise to repay the amount of his loan. But it is not therefore either "subordinate" or "incidental." Indeed it is so important that without it there would be no loan. But when it is furnished the amount borrowed is at once added to the borrower's account. Indeed it is hard to imagine what it is a borrower seeks and gets if not "credit." Moreover in the case of a commercial letter of credit and a bank acceptance, the customer, as the findings show, delivers his cash to the bank precisely in order that it will be on hand to be paid out by the bank against drafts presented by the beneficiary of the letter or the holder of the acceptance. It is impossible to see how, in either of these transactions, the cash is merely "subordinate" or "incidental." In each, what the customer seeks and gets is the use of the bank's credit which he needs in order to satisfy the beneficiary of the letter of credit or the holder of the acceptance who demands a bank's commitment as a condition of doing business with the bank's customer.

The third contention is that the cash collateral accounts are not "commercial accounts." The supporting argument here is "that what Congress intended to be covered by the first part of the statutory definition were *current* accounts, that is, accounts which are maintained for the customers' convenience and are unqualifiedly available to him without restriction,—except only for the passage of time in the case of time deposits." This is only the "ordinary deposit" argument differently expressed.

At a meeting in September, 1935, between officials of FDIC and representatives of various New York banks, one of the latter asked if there was "any special significance to the words in the Act and regulations 'commercial deposits' as distinguished from 'check deposits'." Mr. Riley of FDIC replied: "No, the use of these words is for descriptive purposes only." It is now contended that this ambiguous answer "proves" that Congress in its definition did not mean to depart from the "ordinary deposit" concept. With all respect, I am forced to disagree.

The fourth contention is that "an account which is under the sole control of the bank and to which no one else has access is not a deposit which Congress ever intended either to insure or assess." This contention rests on three equally untenable theories. The first is the "ordinary deposit" theory. The second is that the "not subject to withdrawal" specification of the exclusion provision in the 1950 Act indicates the intent of Congress in 1935 to except funds having that characteristic from insurance coverage. The third theory is that Congress intended to insure only the deposits of those who might start runs on banks.

The first of these theories has been rejected for the reasons stated, and the second theory as well. But a further argument in support of the latter which is advanced under this contention, remains to be considered. It is stated as follows: "The real question about the 1950 exclusion is 'Why did Congress exclude cash collateral?' The legislative history furnishes no answer. It cannot be supposed that Congress decided to exclude cash collateral merely because of whim or caprice. There must have been some reason for the exclusion, and the only logical reason is that cash collateral is by its nature the kind of account that does not belong in a deposit insurance system." Here the initial weakness is that an answer to the defendants' "real question" appears at least five times in the legislative history. For some years prior to 1950 "the banking fraternity," to quote Senator Maybank who sponsored the 1950 Act, had been urging reduction of the assessment rate, "since it was believed that the reserves of FDIC against possible losses were adequate." It was also complaining that the cost in time and money of keeping the records needed to justify deductions from the assessment base and to correctly prepare the semi-annual certified statements, was excessive. Congress, in the 1950 Act, pro-

vided relief from the assessment burden through a system of dividend credits which need not be detailed here. It also provided relief from the costly and time-consuming record keeping, through changes in the formula for computing the assessment base. One of these changes was effected by the exclusion provision quoted earlier in this opinion. Senator Robinson, who presided at the first session, said "the banks have urged us to give them some relief, and that is primarily why we are here today, to work out a plan that would give them some relief and yet keep this system sound." [15] Mr. Maple T. Harl, the Chairman of FDIC's Board of Directors, made the following statement in his testimony before the Senate Committee: [16] "Revision of the assessment base is another important provision of this bill. Requirements of the present law have been viewed as a serious handicap by many bankers and they have contended that the benefits gained from allowable deductions are frequently exceeded by the cost of maintaining the necessary supporting records. In other words, too much red tape. The provisions in this bill for revision of the assessment base will not only simplify the method of computing the assessment, but also will eliminate some of the items now subject to assessment. The banks will benefit from these changes as a result of the reduction of the work in the preparation of the assessment statements. We have endeavored by this particular clause to cut red tape."

Mr. Evans Woollen, Jr., speaking on behalf of the American Bankers Association, endorsed the new provision for computing the assessment base "because the present complicated and laborious method of computation has been a source of unnecessary difficulty for insured banks." [17]

In his report to the Senate following the hearings on the bill, Senator May-

bank said "These changes [in the assessment base] will not materially affect assessment income, and will save the banks considerable expense and annoyance in the keeping of records and the preparation of assessment reports." [18] Thus there is disclosed in the legislative history Congress' reason for enacting the exclusion provision. But what is not disclosed there is any support for the defendants' contention that "the only logical reason" for enacting the exclusion provision "is that *cash collateral is by its nature the kind of account that does not belong in a deposit insurance system*". (Emphasis supplied.) That contention is supportable only on the defendants' theory that the purpose of deposit insurance is much narrower than Congress appears to have intended. This theory, which is repeatedly advanced throughout the defendants' arguments, is that Congress established the deposit insurance system primarily to stop runs on banks and therefore intended that insurance should be limited to the kinds of accounts maintained by those likely to start runs. For example, as noted above, they urge that the balance in a cash collateral account is not an "unpaid balance" because "there is no 'depositor' who can create a run on a bank for these funds." At another point they say: "We may well inquire how there could be any danger that the 'depositors' concerned with the items here in controversy could start runs. Could the 'owner' of a 'deposit' that was standing as collateral for the performance of his obligation to the bank start a run, when that 'deposit' is within the sole control of the bank, and is not withdrawable? Would the United States Government, as the supposed 'owner' of income taxes withheld, start a run? Or, would the 'owner' of unclaimed dividends, who apparently did not even know that the bank held the dividends, start a run?"

---

15. 1950 Senate Hearings p. 60.

16. 1950 Senate Hearings p. 25. See also testimony to same effect by Comptroller of Currency, pp. 44 and 47.

17. 1950 Senate Hearings p. 65.

18. Senate Report No. 1277, 81 Cong. 2 Sess. p. 3.

It is true that some members of Congress and some courts,[19] too, have said that the primary purpose of deposit insurance was to prevent runs on banks. But there is abundant evidence in the records of the hearings both in 1935 and 1950 that the Congressional purpose was not limited merely to this. And there is no evidence that Congress believed bank runs could then, or in the future, be prevented merely through insuring only the funds of those likely to start runs on banks. The banking "holiday" of 1933 was declared, as we all know, because the condition of the banking system as a whole was precarious. It will be readily assumed there were many strong banks, including no doubt the defendants, which could have continued to withstand the effect of the then widespread suspensions by banks throughout the country. But among the questions Congress had to ponder were "What banks?" "How many banks?" and "For how long?" After all, "small" banks were not the only ones which were forced to suspend. It is a well known fact, at least here in New York, that banks which were far from "small," either had to suspend during the late twenties and early thirties or were saved only by the intervention of powerful syndicates. As Mr. Crowley pointed out in 1935, the suspension of one large bank brings others "in its wake." He also said "The benefits of deposit insurance are not limited solely to the protection of the individual depositor. The entire banking structure of the country is so intimately interwoven that a disturbance in any part of the system may cause repercussions of far-reaching proportions. The benefits which will accrue to large city banks because of great stability in the country banks are real and tangible." [20] Moreover it is not only those likely to "start runs" who suffer losses when a bank suspends, but those who do not, as well.

The situation confronting Congress in 1935 was summed up by Mr. Allendoerfer, Vice President of the First National Bank of Kansas City, Mo. As his testimony before the Senate Committee shows,[21] he was far from convinced of the efficacy of deposit insurance. "But," he said, "one must readily admit the actualities of the case, which are that conditions practically demanded that the public be reassured as to their deposits in banks. This could only be done by some form of insurance fund." And while he thought "that assessments on total deposits, instead of on insured deposits, is at least a debatable proposition," he recognized "that if [FDIC] is to be carried on at all, the base on which assessments are levied must be very broad or the rate will be so high as to put many banks out of business." What Congress had to do then, and what it obviously intended to do through the deposit insurance system, was, not merely placate those who had started or might thereafter start runs on banks but, what was much more important, reestablish on a practical foundation confidence in the chartered banking system as a whole among all people throughout the nation.[22]

The fifth and sixth contentions which will be considered together, are: that FDIC's claims in this litigation as to cash collateral accounts, are contrary to three prior rulings of which one was made by its staff and two by its Board of Directors; and that the position taken by the defendants as to those accounts has been consistent throughout the history of deposit insurance.

The "staff ruling" so called, consists of answers by FDIC officials to questions propounded by representatives of New York banks at a meeting of the New York Bank Auditors and Comptrollers Conference, held on Sept. 27 and 28, 1935. The 1935 Act had just gone into

19. See Weir v. United States, 7 Cir., 92 F.2d 634–636, 114 A.L.R. 481, certiorari denied 302 U.S. 761, 58 S.Ct. 368, 82 L. Ed. 590.

20. 1935 House Hearings pp. 10 and 39.

21. 1935 Senate Hearings Part 1, pp. 241 and 242.

22. See Woollen testimony 1950 Senate Hearings p. 64.

effect on Sept. 1. According to the testimony of Mr. Ward, who was then president of the Conference and presided at the meeting, it was called "primarily to educate the New York Banks as to the rules and regulations prescribed to operate the Federal Deposit Insurance Law," and also "to find out what the Government wanted and what the banks could do for them." A transcript of the questions and answers was later forwarded to Mr. Riley, one of the FDIC officials at the meeting. He returned it "edited" on Nov. 7, 1935, to the president of the Conference who caused copies to be distributed among the banks. In his letter of transmittal Mr. Riley said, "We feel that the discussion and answers to questions included in this copy of the proceedings reflect *the procedure which should be followed in completing the certified statements which are to be filed on or before November 15*". [Court's emphasis.] At the meeting the FDIC officials made it clear they were not attempting to lay down final definitive rulings. Mr. Kellog said: "I also wish to emphasize the fact that answers and interpretations which I will give during this discussion represent the present attitude. We realize that from time to time it will be necessary to issue certain specific rules as specific questions arise, and that later we may have information or a set of facts that will require a different treatment than is now intended." Only one copy of the transcript was found in the offices of FDIC. It was lying in the drawer of an unused cabinet. At the trial although FDIC sharply disputed its admissibility, it was received in evidence.

In light of these circumstances, the answers in the transcript appear at best to be of only slight value; and of no value at all to the extent that they conflict with later, considered expressions of the staff after day-to-day experience in the administration of the new law.[23] In any event, precise assessment of the transcript's weight is not now required.

Because, although the defendants "attach and have attached great importance to the answers given in this edited transcript," the testimony shows that not all the answers dealing with matters here involved were accepted or followed by the defendants. Thus Guaranty's Comptroller, when asked on cross examination if he used the transcript as a guide in the interpretation of the statute, replied, "Well, I don't know as it was any real guide." And while Irving's Comptroller said he used it as a guide, he readily admitted to at least one exception, namely, the answer which said that funds in the anticipated acceptances accounts are deposits. This answer, the defendants say, is "demonstrably wrong." Furthermore, neither defendant has ever followed the guidance of the only answer in the transcript which in terms deals with a commercial letter of credit.

The defendants, as has been noted, insist that the balance in account A—cash collateral for commercial letters of credit —is not an "unpaid balance of money," etc., under the first part of the statutory definition. I hold the contrary view. But assuming that my holding is wrong and the defendants' contention correct, there would still remain to be considered whether the letters of credit themselves are "deposits" under Regulation I(c). That question was put to and answered by Mr. Riley as follows: "Is a letter of credit issued by a charge against a customer's account a deposit liability? Mr. Riley: Yes. If your letter of credit is issued by a charge against a depositor's account or for cash and the letter of credit is reflected on your books as a liability, you do have a deposit liability. If, on the other hand, you merely extend a line of credit to your customer, you will only show a contingent liability on your books. In that event no deposit liability has been created." If the defendants had followed that answer as a "guide", they should have included in their assessment bases up to and including July 15, 1950, the face amounts of

---

23. See Niagara Falls Power Co. v. Federal Power Comm., 2 Cir., 137 F.2d 787–792.

the letters of credit themselves. But they omitted them and they attempt to justify the omission on two grounds. The first ground is that Mr. Riley's answer does not require their inclusion "because" as Irving's Comptroller testified, "commercial letters of credit aren't reflected on our books as a direct liability. They are reflected on our books as a contingent liability." The witness has thus construed Mr. Riley's answer to mean only this; that whether a deposit liability results from a commercial letter of credit issued for a charge against a depositor's account or for cash (the situation in account A), depends solely on the accident of the bank's unilateral choice of accounting practice. That seems to me to be a complete distortion of what Mr. Riley said. It is quite clear that in his opinion the essential test is whether the funds involved are those of the customer himself or funds of the bank which have been made available to the customer under a loan, against which, it must be assumed, the bank holds sufficient security. In the context of deposit insurance this would seem to be the only rational and relevant test; because the customer who delivers his own funds to the bank risks their total or partial loss if the bank should suspend operations before they are paid out to the beneficiary or returned to the customer.

The defendants' second ground for omitting the face amount of commercial letters of credit from the assessment base, is that Regulation I(c) refers only to "traveler's" letters of credit which the defendants include in their assessment bases. Logically, however, there is no more reason to protect by insurance the funds delivered to the bank by the purchaser of a "traveler's", than those delivered by the purchaser of a "commercial", letter of credit, except perhaps on theories already rejected. The defendants contend nevertheless that Congress intended otherwise and urge the following five propositions: "The allegation that a fully collateralized *commercial* letter of credit is itself an assessable 'deposit': (1) would nullify the Congressional intention in the 1950 Act to exclude cash collateral; (2) is contrary to the position that the FDIC has consistently taken; (3) would produce a strange accounting result; (4) is not supported by the language of Regulation I; and (5) is not in accordance with general usage." Proposition (1) does not survive examination. The argument is that if Regulation I(c) makes a fully collateralized letter of credit an assessable deposit, then the funds involved may not be excluded from the assessment base after 1950, even though they are, as this Court agrees, "received and held solely to secure [a customer's] liability to the bank." But this conclusion can only result from a patent and radical misconstruction of the exclusion provision. The latter does not, and obviously was not intended to, change the statutory definition of "deposit." Furthermore it certainly does not permit exclusion of merely such funds as are *not* "deposits" under that definition. There was no conceivable need for Congress in 1950 to exclude *non-deposits* from the assessment base, because only "deposits" were ever assessable. The exclusion provision was passed, as already noted, in order to eliminate expensive record making concerning certain classes of funds which prior to 1950 were required to be included as "deposits" in the assessment base. It will not be supposed that Congress spent its time and attention in enacting an utterly needless provision.

Proposition (2) rests on a misconstruction also; of FDIC's claim. The argument here is that, since FDIC claims that the "cash collateral" funds involved in a commercial letter of credit are assessable deposits, it follows that the letters themselves cannot also be assessable deposits, because Congress obviously did not intend to impose two assessments on the same funds. But FDIC does not claim double assessment on the same funds. All it claims is this; either the funds themselves constitute an "unpaid balance," etc., under the first part

of the statutory definition and are therefore assessable, *or* the letters themselves are assessable under Regulation I(c). I agree.

In their argument under proposition (3), the defendants repeat a question which in substance was put to Mr. Tracy, an official of FDIC, on pre-trial examination: "But if a cash collateralized *commercial* letter of credit is to be treated as being itself a deposit, what is to be the accounting treatment in cases where the cash collateral is less than 100% of the *credit* [Court's emphasis], as is often the case with Irving?" The reply was that the amount of the "cash collateral" should be shown as a deposit liability and the remainder of the face amount of the letter should be shown as a contingent liability. Of this the defendants observe, "This division of a single obligation into two separate obligations hardly recommends itself to common sense." But Mr. Tracy's answer does not require that two obligations be made out of one. What is involved is perhaps some cumbersome record keeping, although Mr. Tracy said he thought the practice was common among banks. In any event the bother, if any, does not justify nullification of the statute's obvious intent.

The argument under propositions (4) and (5) is " * * * Regulation I must grammatically be read as 'traveler's checks or traveler's letters of credit,' and such reading is required to make it 'a legal regulation.' " The Court does not agree. And it will not impute to Congress an intention to discriminate in a manner so lacking in logic and so inconsistent with the purpose of deposit insurance, between the funds of a customer who purchases for cash a commercial letter of credit and one who so purchases a traveler's letter of credit.

The three prior rulings which the defendants cite as contrary to FDIC's present claims are an answer by Mr. Riley in the edited transcript and two determinations by the Board of Directors made respectively on Oct. 1, 1935 and May 26, 1939. Preliminarily three facts must be noted here. The first is that, as the defendants concede, "FDIC has never affirmatively ruled in terms that cash collateral for a commercial letter of credit is not a 'deposit'." Indeed in numerous specific instances, as the evidence shows, FDIC's staff has advised banks that such cash collateral is a "deposit" and must be included in the assessment base. The second fact is that FDIC "has never affirmatively ruled in terms" that any of the cash collateral funds here in dispute is not a "deposit." The third is that the defendants do not contend otherwise. They contend merely that, though they have searched, they have been unable to find "differences of any kind that may distinguish the types of cash collateral which FDIC has ruled not to be deposits from the types of cash collateral here in controversy." However, as will shortly appear, the facts on which were predicated the first two rulings, at least, quite substantially distinguish the types there ruled on from those here in controversy.

Mr. Riley's answer and the question to which it was addressed are: "If a loan is made against collateral *and that collateral is sold for the purpose of liquidating the loan* [Court's emphasis], would the proceeds of the collateral be considered a deposit liability if the money received is set up in a credit account and so carried until a certain sum is reached before such proceeds are applied against the loan?" "Mr. Riley: That is not a deposit liability and should not be so considered."

The Board ruling of Oct. 1, 1935, deals with periodic installments of principal on personal loans delivered by a borrower to a Morris Plan Bank or to the personal loan department of any bank having such a department. The Board's minutes show that the facts in the situations it was then passing on are these. Under the loan agreement the borrower is charged interest for the full amount of the loan until it is fully paid. He is also required to make monthly installments of principal and interest. Default on any installment matures the loan, the unpaid

balance of which then becomes due. The installments of principal are not currently entered as credits to the loan account. They are entered as credits in a "special account" in the borrower's name. They, of course, earn no interest and are not subject to withdrawal by the borrower. They are accumulated in the special account until they equal the face amount of the loan. Thereupon compensating entries are made to close out both accounts. The Board ruled that such installments of principal are not "deposits."

Common to each of the foregoing rulings is one basic fact. The funds received by the bank, whether from the sale of pledged collateral or directly from the personal loan borrower, are currently due the bank "for the purpose of liquidating the loan." Thus immediately on their receipt, the bank becomes the unconditional owner of the funds. It has no liability to return them to the borrower and he cannot suffer their loss if the bank should thereafter suspend operations. Accordingly, it is immaterial that the bank, for reasons having to do with the amount of interest to be collected or for some other reason of its own, credits the installments to a "special" account in the borrower's name. This choice of bookkeeping does not make the funds any less the bank's own.

The Board ruling of May 26, 1939, which follows, was occasioned by an inquiry from Manufacturers Trust Company of New York: "Be It Resolved and Determined as Follows: Cash collateral lodged with a bank in an amount substantially equal to the value of securities loaned by it to a customer to enable said customer to effect immediate deliveries of such securities to purchasers and as collateral for the obligation of said customer to make early redelivery of like securities to the bank and not for credit to any commercial, checking, savings, time or thrift account and not to be held in trust for beneficiaries, is not a deposit liability of the bank for purposes of assessment within Section 12B of the Federal Reserve Act, as amended." The ruling was based on an opinion by FDIC's counsel, Judge Birdzell, from

which it appears that the practice of a bank lending bonds from its own investment portfolio to a broker to enable him to make delivery is limited to "a few of the largest banks in vicinity of the security markets," and "the transaction is entirely consummated within a few days." Judge Birdzell's reasoning is sufficiently expressed in the following excerpts from his opinion: "To accommodate the broker, the bank has merely made a hole in its own investment portfolio which it is temporarily filling with the required cash collateral. * * * The broker is not making a deposit to any commercial, checking, savings, time or thrift account, within the definition of the term 'deposit' contained in [the statute]. * * * [The bank] and not the broker, is the beneficial owner of the funds until such time as the borrowed bonds are returned. * * * It would be an anomalous situation indeed which would charge the bank with a deposit liability to extent of its own beneficial interest in the collateral funds. * * * Since the insurance is designed to protect the customer, rather than the bank, and the liability to assessment is governed by the liability of the bank for deposits, the law must be reasonably interpreted to exclude funds which the bank holds for its own benefit." Referring to the last two excerpts, the defendants say their "position in this litigation could not be made clearer." However that may be, it is to be noted that neither Judge Birdzell, the Board of Directors nor the staff of FDIC seem to have considered that opinion, at any time, as requiring them to hold any of the funds here in dispute not to be deposits. On the contrary, on many occasions both before and after the opinion, Judge Birdzell and the staff ruled that cash collateral for commercial letters of credit and ordinary cash collateral on loans constituted deposits and had to be included in the assessment base. Indeed, in 1940, FDIC advised Guaranty in writing that the 1939 "ruling was strictly limited to the circumstances set forth in the ruling." And what is especially significant is the fact that Manufacturers

Trust Company, to which the ruling was addressed, still includes cash collateral for commercial letters of credit in its assessment base. And as already noted, all other banks except Guaranty and Irving do likewise. In light of these circumstances, there is no warrant to apply to cash collateral generally, this obviously special ruling, which has always been so considered by FDIC and which indeed is inconsistent with its other repeated rulings as to cash collateral generally.[24] Nothing in United States v. American Trucking Ass'ns [25] and similar cases is contrary.

■ Finally, the defendants urge that their position as to the funds in dispute here "has been consistent throughout the history of deposit insurance." This, though apparently true, is immaterial. In 1940, Guaranty wrote FDIC that it was not treating cash collateral for commercial letters of credit as an assessable deposit. FDIC did not reply. In 1935 and 1936, Irving advised FDIC in writing that it was not paying assessments on funds received as anticipated acceptances. FDIC took no action on these advices from the defendants until 1950, when it called on all banks which had not reported and paid on such funds to do so. The defendants argue that FDIC's silence for periods of 14 years as to Irving and 10 years as to Guaranty "must be taken as an interpretation of the statute by the agency charged with its administration, that anticipated acceptances [and cash collateral for commercial letters of credit] are not assessable deposits." Reliance for this proposition on Federal Power Comm. v. Panhandle Eastern Pipe Line Co.[26] is misplaced. That case is clearly distinguishable on its facts. The question there was whether the Commission had

statutory power to regulate transfers of leases of natural-gas acreage. The unchallenged finding of the District Court was that, for more than ten years the Commission had never asserted such power; and the Supreme Court agreed with the District and Circuit courts that failure to use the power for so long a time indicated that the Commission did not believe the power existed. FDIC, however, has repeatedly ruled that cash collateral generally and for commercial letters of credit and anticipated acceptances constitute assessable deposits. The failure to reply to the defendants' letters or promptly to start suit for their unpaid assessments does not cancel out FDIC's consistent rulings; nor, it may be added, the compliance therewith by all other banks. The defendants argue in their brief that other banks, though complying with FDIC's rulings, have not acquiesced in them; but on the contrary have paid the demanded assessments only because, in view of other considerations such as taxes, it was to their convenience and advantage to do so. However, the only evidence cited in support of this contention is an answer by Mr. Anderson of FDIC on cross examination, that he had "heard bankers say that." Where he heard it, and when, from whom and under what circumstances were not developed by defendants' counsel. In view of the extensive pre-trial examination in this case, I must assume that if the other banks had paid under protest and only for the reason suggested by the defendants, some written evidence of that would have been disclosed and offered at the trial. No such evidence was offered. Furthermore no official of any of the other banks was called to testify on the point. The cited testimony surely does not justify a find-

---

24. See Helvering v. New York Trust Co., 292 U.S. 455–468, 54 S.Ct. 806, 78 L. Ed. 1361; United States v. Missouri Pacific R. Co., 278 U.S. 269–280, 49 S. Ct. 133, 73 L.Ed. 322; Burnet v. Chicago Portrait Co., 285 U.S. 1–16, 52 S. Ct. 275, 76 L.Ed. 587; Sanford's Estate v. Comm'r, 308 U.S. 39–49, 54, 60 S.Ct. 51, 84 L.Ed. 20; American Surety Co.

of New York v. Bethlehem Nat. Bank, 314 U.S. 314–319, 62 S.Ct. 226, 86 L. Ed. 241.

25. 310 U.S. 534–549, 60 S.Ct. 1059, 84 L. Ed. 1345.

26. 337 U.S. 498–513, 69 S.Ct. 1251, 93 L. Ed. 1499.

ing of non-acquiescence by other banks and I decline so to find.

Account L deals with officers' checks charged against the dollar accounts of Guaranty's foreign branches, to make payment here on behalf of the latter's customers. Such checks seem clearly to come within Regulation I(a). Guaranty contends, however, (a) that a dollar account maintained by the foreign branch with the head office here in New York is not a "deposit" account but only an "inter-office" account; (b) the "head office cannot be indebted to [its branch]"; (c) the "head office has no knowledge, and has no occasion to find out" whether the branch has received money or its equivalent from the foreign customer. It is difficult for me to imagine that the head office is really ignorant of its foreign branch's practice as to dollar accounts, and that Guaranty pays out dollars in this country unless "money or its equivalent" has been received by the foreign branch. In any event, Guaranty, which is in the best position to know the facts, should at least attempt to support its exclusion of these checks from its assessment base. It has not done so either to FDIC or at the trial. In the absence of some such proof, I hold the checks to be deposits under Regulation I(a).

What has been said so far is sufficient to dispose of the first issue. Accordingly it is not necessary to decide, and I do not decide, whether, as FDIC contends, certain of the funds in dispute may also qualify as "trust funds" under the statutory definition.

This brings us to the consideration of the second issue, viz.—whether the funds in accounts A through G, or any of them, not in excess of customers' liability to the banks and which the latter did not include in their assessment bases were "received and held solely for the purpose of securing a liability to the bank." It seems obvious that they are, from the findings already made. FDIC disagrees and urges two propositions in support of its claims. Both are rejected. The first is that since the banks waive confirmation commissions when cash collateral is furnished for commercial letters of credit, the "customer's motive" is merely to save the commission and, therefore, the collateral is not "received" by the bank "solely" to secure such liability. The second proposition is that, since usually the cash collateral is transferred from an existing deposit account in the bank, the funds "have already been received by the banks for another purpose" and thus "obviously are not received solely for the purpose of securing a liability to the bank." The difficulty with the first proposition is that it reads into the statute a factor which Congress certainly did not write into it and which is contrary to its declared purpose in enacting the exclusion provision. The customer's "motive" was not made the test of excludability. Indeed it is to the last degree unlikely that Congress, which said it was seeking to reduce the expense and "red tape" involved in record keeping, intended to make relief depend on such an elusive and difficult-to-record factor as the customer's "motive." And it is immaterial that, as FDIC urges, the bank earns money on the cash collateral. Congress, it must be assumed, knew that a bank, in order to succeed, must earn money, or try to, on all funds entrusted to it, without regard to the source from which its customer draws the funds or his motive in placing them with the bank. The second proposition is no more persuasive than the first. If a man should walk into Guaranty, for example, with $100,000 in currency and deliver it to the bank in order to open a commercial letter of credit, there can be no doubt that the funds would, regardless of the customer's motive, be "received and held [by Guaranty] solely" to secure the liability arising from the issuance of the letter. And obviously this would be true whether the funds had been withdrawn from the customer's safe or from an account in another bank, or from an account in Guaranty. Thus, it seems to me, that Congress which, as its spokesmen said, enacted the exclusion provision to relieve the banks of red tape and expense, cannot be supposed to have intended to make that relief de-

pend on whether Guaranty's customer, usually a foreign bank, had its representative here withdraw the funds from the account in Guaranty himself, or saved everyone's time and expense by authorizing the bank to do it. Surely Congress did not intend that in order to get the benefit the exclusion provision was enacted to afford, the bank must require its customer to get his cash from one Guaranty official and then carry it to another. This would serve no rational purpose; it would, however, repel customers and, at least, double the bank's bookkeeping.

The findings of fact and conclusions of law already set forth seem to me sufficient to support the holding on each of the two issues here decided. If, however, counsel think additional findings or conclusions are necessary to support the holdings, proposals, not inconsistent with this opinion, may be submitted within ten days on notice. Proposals as to facts shall cite the exhibit or testimony relied on.

The proposed judgments are to be submitted on notice.