USCA1 Opinion

 

 September 21, 1994 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ____________________ No. 93-1889 FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER OF NEW BANK OF NEW ENGLAND, N.A., Plaintiff, Appellee, v. FEDDERS AIR CONDITIONING, USA, INC., Defendant, Appellant. ____________________ No. 93-1890 FEDDERS AIR CONDITIONING, USA, INC., Plaintiff, Appellant, v. FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER OF BANK OF NEW ENGLAND, N.A., AND AS RECEIVER OF NEW BANK OF NEW ENGLAND, N.A., ET AL., Defendants, Appellees. ____________________ ERRATA SHEET ERRATA SHEET On page 2, line 1, replace "1886," with "1986,". On page 4, line 5, first full paragraph, replace "bank),"" with "bank"),". On page 12, line 5, paragraph 2, replace "{$250,000]," with "[$250,000],". On page 13, line 6, first full paragraph, replace "preclude" with "precludes". On page 14, line 3, paragraph 2, replace "Williams'" with "Williams". On page 14, line 4, paragraph 2, add the word "of" before the word "attorneys'". UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ____________________ No. 93-1889 FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER OF NEW BANK OF NEW ENGLAND, N.A., Plaintiff, Appellee, v. FEDDERS AIR CONDITIONING, USA, INC., Defendant, Appellant. ____________________ No. 93-1890 FEDDERS AIR CONDITIONING, USA, INC., Plaintiff, Appellant, v. FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER OF BANK OF NEW ENGLAND, N.A., AND AS RECEIVER OF NEW BANK OF NEW ENGLAND, N.A., ET AL., Defendants, Appellees. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Robert E. Keeton, U.S. District Judge] ___________________ ____________________ Before Torruella, Circuit Judge, _____________ Coffin, Senior Circuit Judge, ____________________ and Boudin, Circuit Judge. _____________ ____________________ Richard d'A. Belin with whom Michael A. Albert and Foley, Hoag & __________________ __________________ ______________ Eliot were on brief for appellant. _____ Marta Berkley, Federal Deposit Insurance Corporation-Legal, and _____________ Kathleen C. Stone with whom David C. Aisenberg and Williams & Grainger _________________ __________________ ___________________ were on brief for appellees. ____________________ September 15, 1994 ____________________ BOUDIN, Circuit Judge. On December 1, 1986, Fedders Air _____________ Conditioning, USA, Inc. ("Fedders") signed a contract with Liberty Effingham Limited Partnership ("Liberty") to sell to Liberty a very large warehouse in Effingham, Illinois, owned by Fedders. The warehouse covered 10 acres and the sale price was $7 million. The warehouse was then under lease to a tenant, Sherwin-Williams, and the contract provided that Liberty would assume Fedders' obligations as landlord with an important qualification concerning roof repairs. The Sherwin-Williams lease provided that Fedders would make certain roof repairs, as well as other alterations, to eliminate leakage. In the sale of the warehouse to Liberty, it was intended that Fedders would make the roof repairs at its own expense. Accordingly, Fedders agreed to indemnify Liberty for any loss or expense to Liberty arising under specific repair provisions of the Sherwin-Williams lease. To assure Fedders' performance, the parties agreed that of the $7 million purchase price to be paid by Liberty, Fedders would place $250,000 in escrow with Bank of New England ("the bank"). Liberty made a deposit payment of $50,000 to Fedders and originally intended to give Fedders the balance--$6,950,000-- at the closing; Liberty expected to borrow $6.7 million from Bank of New England and to furnish the balance ($250,000) itself from its own account in the same bank. Fedders, it -2- -2- was intended, would then return $250,000 to Bank of New England to be held in an escrow account for Fedders, pending completion of Fedders' repair obligations under the lease. (The stated figures are approximate, as there were other minor adjustments involved in the closing.) At some point prior to the closing, it occurred to the parties that instead of having the bank transmit the full balance due on the purchase to Fedders and then take back $250,000 for the escrow account, it would be simpler to have the bank retain $250,000 for the escrow account and pay Fedders only the net amount. The parties agreed to follow this course. At the closing in December 1986, Fedders was paid the $6.7 immediately due to it (the $7 million purchase less the $50,000 deposit and $250,00 escrow). For its part, Liberty gave Bank of New England its promissory note for $6.7 million to cover the bank loan needed to complete the purchase. The bank in turn signed the escrow agreement acknowledging that the bank had received the $250,000 "deposit" to be held in escrow and invested in a "commercial bank money market account" (unless otherwise directed). In fact, for reasons that are not explained, the bank did not set up the escrow account, either then or later. Although it held Liberty's note for $6.7 million, the bank appears to have recorded a draw-down on the loan of only $6,450,000. -3- -3- After the closing Fedders did not satisfactorily complete the roof repairs. Liberty eventually replaced the entire roof at a cost of over $1 million. In 1987, Liberty brought suit against Fedders in Massachusetts state court to recover the repair cost from Fedders. Later Liberty added Sherwin-Williams as a defendant, to obtain declaratory relief against it; and Sherwin-Williams then claimed damages from Fedders and Liberty on account of roof leaks it had suffered. In December 1990 Liberty assigned its claim in the case to Bank of New England as part of a workout of its debt to the bank. In January 1991, Bank of New England became insolvent and the Federal Deposit Insurance Corporation became its receiver. 12 U.S.C. 1821(c)(2). The FDIC transferred the Liberty claim against Fedders to New Bank of New England, N.A. ("the bridge "bank")," see 12 U.S.C. 1821(n), as part ___ of a purchase and assumption agreement. New Bank of New England in turn assumed Bank of New England's contractual liability for deposit accounts. In July 1991, the bridge bank was itself dissolved and the FDIC became its receiver. In August 1991 the FDIC, as receiver for New Bank of New England, removed the Liberty suit against Fedders to the district court, see 12 U.S.C. 1819(b)(2), and was substituted for Liberty. -4- -4- In April 1992, Fedders filed suit in federal district court in Massachusetts against the FDIC as receiver for both the failed Bank of New England and for the dissolved bridge bank. On several theories (insured deposit, breach of contract, breach of fiduciary duty, unjust enrichment), Fedders sought to recover the alleged $250,000 escrow. The original Liberty action against Fedders, previously removed to the district court, was partly consolidated with the new Fedders action. The district court tried the two cases as a bench trial beginning on April 12, 1993. Shortly before the trial, Sherwin-Williams made its own settlement and ceased to be a litigant. The district judge, sitting as the factfinder, found against Fedders in the original Liberty action and awarded the FDIC $775,000 for the roof replacement. At a later date, the district judge also rejected Fedders' claims to recover the escrow amount from the FDIC. The court found that Fedders was not a "depositor" entitled to recover an insured deposit because no escrow account had ever been established, saying: The escrow account that [the failed Bank of New England] was contractually bound to create and formally acknowledged that it had created was in fact never created. Fedders therefore never acquired the status of a "depositor," in the sense relevant to the present litigation, notwithstanding [the bank's] assurances in the Escrow Agreement. Consequently, FDIC as receiver did not succeed to any -5- -5- "deposit" liability associated with the phantom escrow account . . . . Although the failure to set up such an account gave Fedders a contract claim against Bank of New England, the court found that Fedders had waived this claim by failing to assert it within the time fixed for asserting claims against the FDIC as receiver for a failed bank. 12 U.S.C. 1821(d). Finally, returning to the original Liberty action, the court awarded the FDIC, as receiver for New Bank of New England, attorneys' fees in the amount of $64,855.91. The court ruled that Fedders was liable for this amount under its indemnity agreement with Liberty, Liberty's rights having been assigned to the failed bank, then acquired by the bridge bank pursuant to the purchase and assumption agreement and finally held by the FDIC as the latter's receiver. How this attorneys' fee award was calculated is an issue to which we will return. Fedders then appealed to this court. First, it disputes the district court's disposition of Fedders' claims against the FDIC relating to the escrow amount. Second, Fedders contests the award of attorneys' fees to the FDIC in the original Liberty action; Fedders does not challenge the underlying award of $775,000 to the FDIC for Fedders' failure to repair the roof. We begin with the escrow issue which is by far the more complicated of the two, and thereafter address the attorneys' fees award. -6- -6- At the outset, it is important to understand that Fedders' central claim on appeal is that it has made a "deposit" in Bank of New England, which the FDIC has committed itself to honor without regard to the normal $100,000 limitation or any objection as to the timeliness of a "deposit" claim.1 The FDIC in turn does not dispute this alleged commitment but asserts that there was no "deposit" within the meaning of the statute and, further, that its regulations make the bank's records conclusive. This is a civil case, and we take the issues as the parties have framed them. One begins in construing a statute with its language. The statutory definition of deposit is two pages long, 18 U.S.C. 1813(l), but Fedders relies principally upon clauses _ that include as deposits two specific categories: "the unpaid balance of money or its equivalent received or held by a bank . . . in the usual course of business and for which it has given or is obligated to give credit," and "money received or held by a bank . . . in the usual course of business for a ____________________ 1The FDIC as receiver is not the insurer of deposits-- the FDIC insures in its corporate capacity--but the FDIC does pay off insured deposits, taking the money from the appropriate insurance fund. 12 U.S.C. 1821(f). The FDIC waived the ordinary $100,000 limit in this case. It also has not claimed that the request for return of an insured deposit is untimely, nor has it offered any objection based on its separate capacity as insurer and receiver. -7- -7- special or specific purpose . . . including . . . escrow funds . . . ." 12 U.S.C. 1813(l)(1), (3). _ In response, the FDIC has chosen to stress the underlined phrase that is part of the definition of deposit under both subparagraphs of section 1813(l) relied on by _ Fedders: money or its equivalent received or held by a bank ________________ in the usual course of business. The FDIC also underlines the term "account" which appears only in subparagraph 1, defining "deposit" to include the unpaid balance of money or its equivalent received or held by a bank . . . in the usual course of business and for which it has given or is obligated to give credit, either conditionally or unconditionally, . . . to a[n] . . . account . . . . Here, says the FDIC, Bank of New England "did not receive any money from Fedders, and there was no account." On the basis of this language, the FDIC distinguishes a number of cases, several of which are older but otherwise helpful to Fedders, such as FDIC v. Records, 34 F. Supp. 600 ____ _______ (W.D. Mo. 1940) (deposit insurance covered payment to cashier who pocketed the cash). More important, the reference to money "received or held" encourages the FDIC to rely on FDIC ____ v. Philadelphia Gear Corp., 476 U.S. 426 (1986). "The ________________________ analysis" in that case, the FDIC tells us, "is much the same in this case." We can easily put to one side two of the FDIC's three points based on the statute and Philadelphia Gear. The fact _________________ -8- -8- that Fedders paid no money to the bank means nothing; Liberty gave the bank a note, readily described as "the equivalent" of money, to cover a loan by the bank to Liberty, $250,000 of which the bank promised to retain as an escrow deposit for Fedders. Thus, the equivalent of money was "received." Indeed, nothing in the substance of the transaction would be different if, as the parties had originally intended, the bank had given Fedders the $250,000 and Fedders had immediately given it back to the bank. Philadelphia Gear is likewise not in point. There the _________________ Supreme Court rejected a claim that a standby letter of credit backed by a contingent promissory note qualified as a "deposit" under section 1813(l)(1). Although the FDIC _ admitted that an ordinary letter of credit would be treated as a deposit, it distinguished the standby letter (a promise by the bank to pay the seller only if the buyer did not) based on an administrative practice of not treating standby letters as deposits. In accepting this longstanding interpretation, the Court noted that the buyer who authorized the letter had not even given the bank anything beyond a contingent promise to pay. Id. at 440. __________ ___ But Philadelphia Gear did not say that it is a condition _________________ of all "deposits" that hard currency be paid to the bank; the Court was concerned with distinguishing narrowly between standby and ordinary letters of credit. In fact the Court -9- -9- noted the FDIC's own concession that an ordinary letter of credit in the seller's favor, backed by the buyer's unconditional promissory note, would be a deposit. Id. at ___ 440. Here, such an unconditional note for a sum including _________ the $250,000 escrow was given to the bank. Although the "held or received" language and Philadelphia Gear are red herrings, the remaining point in _________________ the FDIC's statutory argument--the statutory reference to an "account"--does deserve attention. Under the statute, the money or its equivalent must not only be held or received by the bank, but must (unless another alternative condition is satisfied) be a payment "for which [the bank] has given or is obligated to give credit . . . to a[n] . . . account." 12 U.S.C. 1813(l)(1). Here, the FDIC says, there was no _ account, so the money or its equivalent cannot be deemed a deposit. We agree with the FDIC, and with the district court, that there was no account established pertaining to the $250,000 escrow; but the statute speaks not only of money or its equivalent for which the bank "has given" credit to an account but also money or its equivalent for which the bank "is obligated" to give credit to an account. Here Liberty gave a promissory note to the bank in exchange for a loan, $250,000 of which the bank promised to place in an escrow account for Fedders. Although the bank failed either to -10- -10- create the account or deposit the money in it, it does appear that it was "obligated" to give credit to an account for this amount. Fedders relied on the "obligated" language in its brief, and the FDIC has not answered it. There may be answers not obvious to us in this very technical area. Still, the five paragraphs of section 1813(l) define "deposit," technically _ but elaborately, to cover a very large number of transactions, many of which might not be called deposits by a lay person. In sum, we hold that the promissory note was the equivalent of money; that it was held or received by the bank in the usual course of business to support a loan; and that in exchange the bank was "obligated" to credit an account in the amount of $250,000. We do not reach the alternative argument made by Fedders that the "escrow" reference in subparagraph 3 makes the transaction a deposit even if subparagraph 1 does not. We do note that there is no parallel "obligated" language in subparagraph 3, and the FDIC could argue that only funds actually treated by the bank as escrow funds are embraced by subparagraph 3. But the FDIC has made no expressio unius ________________ argument that an escrow payment excluded from subsection (3) is automatically outside subsection (1), and we doubt that any such exclusivity is implied. -11- -11- The FDIC's other line of defense is its own regulation; under 12 C.F.R. 330.3(h), it asserts that "the deposit account records of the failed bank are controlling for ___________ purposes of determining deposit insurance coverage." That section, after explaining that ownership under state law of funds on deposit is a necessary condition for insurance coverage, continues: "Deposit insurance coverage is also a function of the deposit account records of the insured depository institution . . . which, in the interest of uniform national rules for deposit insurance coverage, are controlling for purposes of determining deposit insurance coverage." The FDIC then tells us that "numerous courts" have held that the FDIC may rely "exclusively" on the "account records" of the failed institution to determine deposit insurance coverage. Assuming this to be so, we fail to see why the FDIC believes that "account records" are missing in this case. Far from defining "account records" narrowly, a companion regulation states that "deposit account records" include a variety of specific items (e.g., account ledgers, ____ certificates of deposit, authorizing corporate resolutions) and "other books and records of the insured depository ___ institution [including computer records] which relate to the depository institution's deposit taking function . . . ." 12 C.F.R. 330.1(d) (omitting exclusions not here relevant). -12- -12- In this case the district court made a specific finding, not challenged by the FDIC on appeal, that Bank of New England "held . . . . a copy [of the escrow agreement] in its records." This agreement, signed on behalf of the bank, explicitly acknowledged "receipt of said amount [$250,000]," denominated the "Deposit"; and the document provided for the deposit to be invested in a "commercial bank money market account" (unless a different investment was approved by Fedders in writing). In other words, the bank's books and records did include evidence of the "deposit." We might have a different case if the FDIC had disputed the amount of the deposit and invoked 12 C.F.R. 330.3(i). That regulation does purport to make the "deposit account" conclusive as to the "amount" of a deposit. Assuming a "deposit account" is something narrower than the bank's books and records--which it may well be--the FDIC has never challenged the $250,000 figure nor has it relied upon subsection (i). Once again, after years of litigation, it is fair to resolve the case in the terms that the parties have presented it. Accordingly, we think it is unnecessary for us in this case to plunge ourselves into the morass of decisions that bear on whether and when erroneous bank records are _________ conclusive against the depositor and when correctly recorded but unauthorized activity by a bank (e.g., paying an insured ____________ ____ -13- -13- account to a thief) precludes an insurance claim.2 These cases reflect the severe tension between two values: the legitimate expectations of the depositor and the regulator's desire to rely upon existing records to expedite the handling of bank emergencies. Not surprisingly, the cases do not all point the same way. Here, however, the FDIC's premise that the "deposit account records" defeat Fedders' claim is mistaken. What remains is the Fedders attack on the district court's award of attorneys' fees. The only basis for such fees was the clause in the indemnity agreement between Fedders and Liberty incident to the purchase and sale of the warehouse and the latter's assumption of the Sherwin-Williams lease. The agreement, as construed by the district court, required Fedders to indemnify Liberty for attorneys' fees arising from litigation related to certain roof-repair provisions of the lease. The FDIC has succeeded to Liberty's rights of indemnification. In the district court the FDIC urged that the indemnity covered all of its attorneys' fees incurred in the roof ___ repair action originally brought by Liberty against Fedders. The district court, however, determined that only the portion ____________________ 2See, e.g., In Re Collins Securities Corp., 998 F.2d 551 ___ ____ _____________________________ (8th Cir. 1993); Abdulla Fouad & Sons v. FDIC, 898 F.2d 482 _____________________ ____ (5th Cir. 1990); Jones v. FDIC, 748 F.2d 1400 (10th Cir. _____ ____ 1984); FDIC v. Irving Trust Co., 137 F. Supp. 145 (S.D.N.Y. ____ ________________ 1955); FDIC v. Records, 34 F. Supp. 600 (W.D. Mo. 1940). ____ _______ -14- -14- of Liberty's or the FDIC's attorneys' fees that related to Sherwin-Williams own lease claims, asserted by Sherwin- Williams in that case, were covered by the indemnity agreement. Sherwin-Williams ceased to be a party after very lengthy pretrial activity but shortly before the trial itself. On appeal, this construction of the indemnity is not disputed by either side. The only issue concerns the district court's apportionment of counsels' bills. Because the Liberty and FDIC counsel had not kept records to segregate particular hours to work relating to the Sherwin-Williams' claims, the district court made its own apportionment. Of the $165,000 of attorneys' fees incurred by Liberty or the FDIC in Liberty's action, counsel estimated for the court that 50 percent of the total attorney time was attributable to the Sherwin-Williams claims. The district court found this boilerplate conclusion insufficient standing by itself; but its own evaluation of the record persuaded it that the work done by Liberty or FDIC counsel on the Sherwin- Williams claims justified an award of just under $65,000 in attorneys' fees, calculated as follows: First, of the fees incurred by Liberty between April 1988 and March 1991, the district court found that just under $25,500 was attributable to the Sherwin-Williams claims (rather than the $36,000 claimed by the FDIC based on its 50 percent apportionment). The court examined each of the -15- -15- invoices submitted by counsel and for each one made a separate estimate (ranging from 15 to 50 percent) as to the portion of each invoice so attributable. The court said it was resolving all ambiguities against the FDIC since it bore the burden of proof as to fees. Second, of the fees incurred by the FDIC, as receiver of the banks who succeeded to Liberty's interest, the court found that just under $40,000 was attributable to the Sherwin-Williams claims (instead of the $46,500 claimed by the FDIC). The court assigned to those claims 50 percent of the fees incurred prior to December 31, 1992, based on its review of the relevant docket entries; and it similarly assigned 25 percent of the fees between that date and April 8, 1993 (when Sherwin-Williams settled its claims) since by 1993 the roof repair claim against Fedders was moving toward trial and the Sherwin-Williams damage claims toward settlement. Fedders' argument on this appeal is straightforward. The company does not attack any of the specific computations made by the court. Instead, it says simply that Fedders' indemnity commitment to Liberty is a contract governed by Illinois law; that Illinois law requires "detailed proof of the amount and basis" for attorneys' fees even where attorneys' fees are promised by contract; and that such detailed proof was not supplied in this case. Fedders' main -16- -16- authority, Kaiser v. MEPC American Properties, Inc., 518 ______ ________________________________ N.E.2d 424 (Ill. App. 1987), does indeed say that the attorneys' fee claimant must present "detailed records maintained during the course of the litigation containing facts and computations upon which the charges are predicated." Id. at 428. ___ We will assume from the district court's description of what the court had to do (and from the FDIC's silence on this point) that the FDIC counsel certainly did not furnish information needed to separate the Sherwin-Williams time from the remaining time. But while such a deficiency would surely permit the district court to reject the fee application, nothing in Kaiser requires that the court do so if it can ______ __ fill the gap in proof itself. In fact, in Kaiser the ______ appellate court appeared to agree with the claimant that "the trial court ha[d] the discretion to consider the content of the record [i.e., "the entire case file"] to determine a ____ reasonable fee"; but the court upheld the trial judge's discretionary decision not "to conduct the in-depth examination necessary to locate documents and pleadings" to substantiate individual items. 518 N.E.2d at 429. Even if we treat Kaiser as an authoritative statement of ______ Illinois law--and the FDIC disputes this--it arguably licenses, and certainly does not clearly preclude, a trial judge's own decision to supply from elsewhere in the record -17- -17- supporting information and inferences that the claimant neglected to collect. Here, the district court made precisely this effort, explaining that the FDIC's original fee request was based on a reasonable reading of the indemnity, even though the court ultimately read the indemnity more narrowly. This course was not required, but neither do we see why it was forbidden. Fedders identifies no other error in the calculations. It does not try to show how the fee request information was deficient beyond the obvious failure to allocate (except by the inadequate boilerplate 50 percent estimate alleged to reflect all of the work over a lengthy period). Nor does Fedders offer specific attacks upon the district court's own computations (which were several pages long)--for example, the decision to assign 25 percent of the April 1, 1988, invoice to the Sherwin-Williams claims--by seeking to show that they are irrational or without basis. Limiting ourselves to the narrow challenge made by Fedders, we conclude that the award of attorneys' fees was justified. More broadly, we think that the district court admirably handled this complex, double-barreled law suit and agree with its treatment of practically all of the issues raised. On the single one where we part company--the "obligated" clause of section 1813(l)(1)--we note that the district court did _ -18- -18- not discuss the clause, possibly because it was not stressed by counsel at the trial or the subsequent hearing. The judgment is affirmed in part and reversed in part _______________________________________ and the matter remanded to the district court in order to permit the judgment entered against Fedders in favor of the FDIC to be adjusted--whether by reduction or by a counter judgment in favor of Fedders--to reflect the $250,000 deposit that the bank was obligated to escrow (including any interest adjustment that the district court may find appropriate) and that is now owing to Fedders. No costs. It is so ordered. ________________ -19- -19-