UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT


No. 95-1492

MIGUEL VILLAFA E-NERIZ,
INSURANCE COMMISSIONER OF PUERTO RICO,

Plaintiff - Appellant,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, ET AL.,

Defendant - Appellee.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. P rez-Gim nez, U.S. District Judge] 



Before

Torruella, Chief Judge, 
Campbell, Senior Circuit Judge, 
and Watson,* Senior Judge. 



Carlos J. Morales-Bauz , with whom Rossell -Rentas & Rabell- 
M ndez was on brief for appellant. 
J. Scott Watson, Counsel, Federal Deposit Insurance 
Corporation, with whom Ann S. DuRoss, Assistant General Counsel 
and Richard J. Osterman, Jr., Senior Counsel, Federal Deposit 
Insurance Corporation, were on brief for appellee.



February 2, 1996

 

* Of the United States Court of International Trade, sitting by
designation.

TORRUELLA, Chief Judge. This appeal seeks review of a TORRUELLA, Chief Judge. 

decision of the United States District Court for the District of

Puerto Rico, which entered summary judgment on behalf of appellee

the Federal Deposit Insurance Corporation ("FDIC"), in its

corporate capacity. Appellant Miguel Villafa e-Neriz, Insurance

Commissioner of Puerto Rico (the "Commissioner") seeks to recover

FDIC deposit insurance for the $50,000 value of a certificate of

deposit (the "Certificate" or the "CD") purchased by the Guaranty

Insurance Company ("Guaranty"), which was assigned to the

Commissioner simultaneously with its purchase. The district

court held that the FDIC properly relied on the books and records

of an insolvent institution in making its determination that the

Commissioner was not entitled to deposit insurance. The sole

issue before us is whether the district court erred in granting

summary judgment against the Commissioner in his action against

the FDIC in its corporate capacity.1 For the reasons stated

herein, we affirm.

BACKGROUND BACKGROUND

The facts of this case are undisputed. On July 20,

1983, in compliance with the Puerto Rico Insurance Code's

statutory deposit requirement, 26 L.P.R.A. 801-809 (1976),

Guaranty purchased the six-month CD from the Girod Trust Company

 

1 In its corporate capacity, the FDIC functions as a bank
regulator and insurer of bank deposits. 12 U.S.C. 1818,
1821(a) (1988 & Supp. 1991). The Commissioner does not seek
review of that part of the district court decision that dismissed
the complaint as against the FDIC as receiver of the former Girod
Trust Company.

-2-

("Girod" or the "Bank") in the principal amount of $50,000. On

the same day Guaranty assigned and conveyed its interest in the

Certificate to the Commissioner. Girod was not a party to the

assignment. Another document was executed on the same date,

entitled "Requisition to the Bank." This document stated, inter 

alia, that Girod would not release the funds represented by the 

CD, "whether the principal value or income thereof," without the

Commissioner's authorization. The Certificate was itself given

to, and remains with, the Commissioner.

Less than three months after purchasing the Certificate

from Girod, Guaranty executed a loan agreement, unrelated to the

CD, pursuant to which it borrowed $600,000 from Girod. A

promissory note for that amount, payable to Girod, evidenced the

loan, and was due on April 26, 1984. On January 17, 1984, the CD

became due, and was "rolled over" -- extended for a term of six

additional months -- at Guaranty's request. In the meantime,

Guaranty had fallen behind on payments due to the Bank under the

$600,000 loan agreement. On July 16, 1984, the CD came due

again. Two days after its maturity, on July 18, $50,000 in

proceeds from the Certificate was credited toward Guaranty's

outstanding indebtedness under the $600,000 loan agreement.

On August 16, 1984, Girod was declared insolvent and

the FDIC was appointed as receiver. Four months later, on

December 19, 1984, Guaranty also became insolvent, and the

Commissioner was appointed its receiver in turn. As such, on

August 25, 1986, the Commissioner filed a proof of claim with the

-3-

FDIC, seeking payment on the CD. Having received no payment on

the claim, the Commissioner filed a complaint against the FDIC in

the Superior Court of Puerto Rico on May 22, 1991, seeking to

recover the proceeds of the CD. The FDIC removed the action to

federal court pursuant to 12 U.S.C. 1819(b), and the parties

filed cross-motions for summary judgment. Without ruling on the

motions, the district court requested submission of briefs on the

application of 12 U.S.C. 1823(e). The court then held that

that section barred the Commissioner's reliance upon either the

Assignment or the Requisition, and ordered summary judgment in

favor of the FDIC. On appeal in Villafa e-Neriz v. FDIC, 20 F.3d 

35 (1st Cir. 1994), this Court reversed the judgment of the lower

court and remanded the case for further proceedings consistent

with its opinion. On February 7, 1995, the district court

entered summary judgment dismissing the complaint. It is

undisputed that the entire amount of the Certificate was set off

against Guaranty's indebtedness, that the CD no longer appeared

on the bank's books and records at the time the bank failed, and

that the Certificate itself remains in the Commissioner's

possession. 

DISCUSSION DISCUSSION

A. Standard of Review A. Standard of Review 

This case centers on whether the FDIC, in its corporate

capacity, was correct in determining there was no insured

deposit. As the essential facts are not in dispute, and all that

is before us is a question of law, our review of the district

-4-

court's decision is de novo. See, e.g., FDIC v. Keating, 12 F.3d 

314, 316 (1st Cir. 1993). This Circuit has not yet decided which

standard a district court should use when reviewing FDIC

insurance claim determinations. 

There is a dispute among the circuits as to the

underlying standard that should apply to the review of an FDIC

insurance claim determination. The majority of circuits which

have addressed the issue apply the deferential standard set out

in Section 706 of the Administrative Procedure Act ("APA"), 5

U.S.C. 701-706 (1994). See, e.g., Metro County Title, Inc. v. 

FDIC, 13 F.3d 883, 886 (5th Cir. 1994) (direct petition to court 

of appeals for review of FDIC determination); Nimon v. RTC, 975 

F.2d 240 (1992) (direct petition to court of appeals for review

of Resolution Trust Corporation determination); In re Collins 

Sec. Corp., 998 F.2d 551, 553 (8th Cir. 1993) (review of district 

court decision); Fletcher Village Condominium Ass'n. v. FDIC, 864 

F. Supp. 259, 263 (D. Mass. 1994). The APA mandates that

reviewing courts set aside agency findings that are "arbitrary,

capricious, an abuse of discretion, or otherwise not in

accordance with law." 5 U.S.C. 706(2)(A). Under this

deferential standard a court would "review the evidence anew and

determine whether the administrative action was arbitrary and

capricious." First Nat'l Bank of Fayetteville v. Smith, 508 F.2d 

1371, 1374 (8th Cir. 1974), cert. denied, 421 U.S. 930 (1975); 

see, e.g., Hymel v. FDIC, 925 F.2d 881, 883 (5th Cir. 1991).  

However, a recent decision by the D.C. Circuit creates

-5-

a second option, holding that review of FDIC determinations, to

be undertaken at the district court level, should be de novo 

rather than under the deferential APA standard. See Callejo v. 

RTC, 17 F.3d 1497 (D.C. Cir. 1994). The Callejo court based its 

rejection of the APA on its reading of 12 U.S.C. 1821(f) (1988

& Supp. 1991), which provides for judicial review of disputed

deposit insurance claims, and its revision under the Financial

Institutions Reform, Recovery, and Enforcement Act of 1989.

Callejo, 17 F.3d at 1501 (concluding that 1821(f)(3) "supplants 

the APA and sets up a different relationship between the agencies

and the courts"); see Pub. L. No. 101-73, 103 Stat. 183 (1989); 

cf. Pennsylvania v. FDIC, 881 F. Supp. 979, 983 (E.D. Penn. 1995) 

(rejecting Callejo's logic but nonetheless applying de novo 

standard of review on other grounds). This Circuit has expressly

adopted the aspect of the Callejo decision which holds that 

initial jurisdiction to review claims for insurance benefits lies

in the district court rather than in the court of appeals.

Massachusetts v. FDIC, 47 F.3d 456, 458 (1st Cir. 1995). 

However, the decision in that case was limited to Callejo's 

jurisdictional holding. Id. at 460. Thus, Massachusetts v. FDIC 

does not determine the district court's standard of review in the

present case, and our decision to postpone the discussion does

not clash with our earlier decision. 

The district court did not explicitly state which

standard of review it was applying, although it did make an

isolated reference, midway through its opinion, to the

-6-

"arbitrary, capricious and contrary to law" standard. We need

not determine which standard the district court should have

applied at this time, since we agree with the FDIC that under

either the APA "arbitrary and capricious" or the Callejo de novo 

standard, the district court's decision is correct. Thus we

postpone discussion regarding the applicable standard of review

in light of Callejo for another day. 

B. Was this an insured deposit? B. Was this an insured deposit? 

At the core of the parties' dispute is whether the

Commissioner was entitled to deposit insurance. That issue

depends on whether there was an insured deposit at the time of

Girod's failure, a question which in turn hinges on whether and

when erroneous bank records are conclusive. It is undisputed

that the Bank's account records did not disclose the existence of

an account on the date Girod failed, and that the original

Certificate is in the possession of the Commissioner, and has

been since July 1983. The FDIC argues that under its regulations

and the applicable case law, it is justified in relying solely on

the failed Bank's account records, so that its refusal to provide

insurance was proper. The Commissioner counters that under

Puerto Rico law the FDIC should have known the setoff was

improper, because the Certificate was not in the bank's

possession. Because we agree with the FDIC, we affirm the

decision of the court below.

In the Federal Deposit Insurance Act, 12 U.S.C. 

1811-1831(d) (1982) (as amended), Congress defined "deposit" to

-7-

mean "the unpaid balance of money or its equivalent received or

held by a bank or savings association in the usual course of

business and for which it has given or is obligated to give

credit, either conditionally or unconditionally, . . . or which

is evidenced by its certificate of deposit . . . ." 12 U.S.C. 

1813(l)(1) (Supp. 1995). "Insured deposit" is defined in turn as

"the net amount due to any depositor for deposits in an insured

depository institution as determined under sections 1817(i) and

1821(a) of this title." 12 U.S.C. 1813(m)(1) (1988 & Supp.

1991). 

The FDIC contends that it is entitled to rely

exclusively on the account records of the failed institution --

and so it did not have to look further afield to track down the

Certificate. Our analysis of the FDIC regulations, the body of

case law, and the policy concerns underlying these regulations

leads us to agree. First, the FDIC regulations, promulgated

under congressional authorization, Abdulla Fouad & Sons v. FDIC, 

898 F.2d 482, 484 (5th Cir. 1990), themselves provide that the

amount of an insured deposit at the closing of a failed bank

shall be "the balance of principal and interest unconditionally

credited to the deposit account as of the date of default of the

insured depository institution." 12 C.F.R. 330.3(i)(1) (1995).

Indeed, the regulations specify that, while ownership under state

law is one prerequisite for insurance coverage, the deposit

account records are controlling:

Deposit insurance coverage is also a
function of the deposit account records

-8-

of the insured depository institution, of
recordkeeping requirements, and of other
provisions of this part, which, in the
interest of uniform national rules for
deposit insurance coverage, are
controlling for purposes of determining
deposit insurance coverage.

12 C.F.R. 330.3(h) (including regulatory exceptions not

relevant here). Reviewing courts have treated these regulations

implementing and interpreting the statutory provisions dealing

with deposit insurance with some deference.2 See FDIC v. 

Philadelphia Gear Corp., 476 U.S. 426, 437-38 (1986); see, e.g., 

Raine v. Reed, 14 F.3d 280, 283 (5th Cir. 1994); Collins, 998 

F.2d at 555; cf. Chevron U.S.A. Inc. v. Natural Resources Defense 

Council, Inc., 467 U.S. 837, 842-44 (establishing doctrine 

treating agency's view of a statute with deference when the

statute is ambiguous), reh'g denied, 468 U.S. 1227 (1984). 

Second, a series of policy considerations underlie the

FDIC's practice of relying on the books and records in making

deposit insurance determinations. In purchase and assumption

transactions,3 the FDIC often must make its determinations
 

2 The Commissioner asks us to note that "deposit account
records" are defined to include certificates of deposits and
"other books and records of the insured depository institution, .
. . which relate to the insured depository institution's deposit
taking function." 12 C.F.R. 330.1(d) (1995). This language
proves unhelpful, however, since it is undisputed that there was
no Certificate among the Bank's records at the time of failure.
Had the Certificate remained in the records, this case would
likely not have arisen.

3 A purchase and assumption transaction occurs when, in its
capacity as receiver, the FDIC sells a failed bank's healthy
assets to a purchasing bank in exchange for that bank's promise
to pay the depositors of the failed bank. FDIC-receiver next
sells the 'bad' assets to itself as FDIC-corporate. FDIC-

-9-

overnight. See Raine, 14 F.3d at 283 ("We will not undermine the 

speed and efficiency of bank takeovers by imposing a requirement

upon the FDIC to locate and evaluate every possible avenue of

disputed liability in implementing the takeover of a failed

bank."); McCloud v. FDIC, 853 F. Supp. 556, 559 (D. Mass. 1994). 

Making quick determinations both facilitates the public's access

to its savings, Abdulla Fouad, 898 F.2d at 485, and maintains the 

going concern value of the failed bank, Raine, 14 F.3d at 283. 

Finally, the regulations also avoid fraudulent increases in

insurance coverage by preventing the creation of separate trust

accounts after default has occurred. See Baskes v. FSLIC, 649 F. 

Supp. 1358, 1360 (N.D. Ill. 1986).

Third, there is "a well-grounded history of permitting

the FDIC to rely exclusively on the books and records of an

insolvent institution in effectuating the takeover of banks and

in making the many deposit insurance determinations which are

necessary to that task." Raine, 14 F.3d at 283; see McCloud, 853 

F. Supp. at 559 (describing the "seemingly solid phalanx of law

establishing the conclusiveness of bank account records"); see 

also Abdulla Fouad, 898 F.2d at 484 (providing statutory and 

regulatory basis for FDIC reliance on deposit account records).

 

receiver uses the money received to pay the purchasing bank to
make up the difference between what the purchasing bank was
willing to pay for the good assets and what it must pay out to
the failed bank's depositors. FDIC-corporate then tries to
collect on the bad assets. This purchase and assumption
generally needs to be executed with speed, often overnight.
Timberland Design, Inc. v. First Serv. Bank For Sav., 932 F.2d 
46, 48 (1st Cir. 1991).

-10-

This reliance on the books and records draws on the FDIC

regulations: the "FDIC's longstanding practice of looking

primarily at the failed bank's deposit account records in

determining insurance claims is clearly a permissible

interpretation of [its] statutory mandates." Collins, 998 F.3d 

at 554. Indeed, the case law the FDIC cites states that a bank's

closing is "the seminal point" of the FDIC's determination.

"That event not only trigger[s] the liquidation process, but it

also cast[s] in stone the relationship of [plaintiff] to the

bank." FDIC v. McKnight, 769 F.2d 658, 661 (1985), cert. denied 

sub nom., All Souls Episcopal Church v. FDIC, 475 U.S. 1010 

(1986).

In fact, the case law supports the FDIC's dependence on

the books and records of the Bank at the time of failure even

though the balance was a result of alleged unauthorized

activity.4 See Abdulla Fouad, 898 F.2d at 484-85 (finding that 

plaintiff's position that the FDIC should have searched bank

credit files and other records before denying a claim goes

against statutory and regulatory authority); Fletcher Village, 
 

4 This circuit has not previously reached the issue of whether a
bank's correctly recorded but unauthorized activity precludes an
insurance claim. See FDIC v. Fedders Air Conditioning, 35 F.3d 
18, 23 (1st Cir. 1994). Indeed, in the present case's first
appearance before this court, we noted we had not decided
"whether or to what extent we would be willing to follow the
Eighth Circuit's holding in In re Collins." Villafa e-Neriz, 20 
F.3d at 40 n.6. In affirming the district court's decision
today, we adopt much of the logic of the Collins decision, as 
well as the decisions of the district court for Massachusetts
which have decided similar cases. See Fletcher Village, 864 F. 
Supp. at 265 (adopting the reasoning of Collins); McCloud, 853 F. 
Supp. at 559.

-11-

864 F. Supp. at 265 ("To hold the FDIC liable for the errors and

omissions inherent in almost any routine banking transaction

would divert the FDIC from its core mission of protecting the

banking system from an ultimate catastrophe."). In their

analysis, "[t]hese cases reflect the severe tension between two

values: the legitimate expectations of the depositor and the

regulator's desire to rely upon existing records to expedite the

handling of bank emergencies." Fedders Air Conditioning, 35 F.3d 

at 23.

The Eighth Circuit's analysis in the factually similar

In re Collins proves illustrative. In that case, as here, the 

purchaser of a certificate assigned the proceeds to a third

party, Collins. The proceeds, however, were paid to the

purchaser's account, and the CD account was reflected on the

institution's account records as closed. Collins, 998 F.2d at 

552-53. The trustee for the bankrupt Collins sought to recover

from the institution for paying out the CD account despite the

assignment, alleging negligence and breach of contract.

Following the institution's insolvency, the FDIC in its corporate

capacity denied deposit insurance, and the trustee sought

judicial review of its denial. Id. at 553. The court of appeals 

held that the FDIC properly relied on the books and records of

the failed institution to deny deposit insurance, noting that the

institution's "mistaken payment may not have affected Collins's

rights against the bank, but it did extinguish the insured

amount." Id. at 554. In short, it reasoned that "[d]eposit 

-12-

insurance protects depositors from loss due to the bank's

insolvency, not loss from the bank's pre-insolvency mistakes."

Id. at 555. We find the Eighth Circuit's reasoning convincing in 

the present case as well.

The Commissioner seeks to differentiate Collins on 

several bases. First, he argues that the mistake in Collins was 

a simple bank error, id. at 552-53, while the "cancellation" in 

the current case is not a simple mistake, but rather was illegal

on its face. We do not find the distinction relevant. In both

cases, the account was cancelled without regard to the CD's

assignment, and the bank's records had not reflected the

assignment. Second, he finds it significant that the decision in

Collins noted not only that the account in controversy been 

closed at least a full year before the bank was declared

insolvent, but also that the insolvent bank had not paid deposit

insurance premiums for the account. See id. at 553-54. Here, 

the Commissioner contests, Girod paid deposit insurance premiums

on the CD account, which was cancelled less than a month before

the bank was taken over and a few days after the Treasury

Department of Puerto Rico conducted the investigation that led to

the bank's closing. Again, we are not convinced of the

distinction. In Collins, the court's determination was based on 

the fact that the records of a failed bank indicated the amounts

that were insured, and the accounts for which the FDIC collected

deposit insurance premiums. The length of time that the account

was closed, or the insurance premiums unpaid, was not the key:

-13-

the crucial factor was the reasonableness of the FDIC reliance on

the records. See id. at 554. Collins noted that the CD account 

was not an insured deposit for which premiums were paid, and

found that Collins' trustee had "confus[ed] the right to recover

from the bank with the right to withdraw from an insured

account." Id.  

Raine v. Reed offers another example of an analysis 

upholding the FDIC's exclusive reliance on the books and records

of a failed institution. Raine was a victim of unauthorized

withdrawals from automatic teller machines, who notified her bank

of the withdrawals and sought to have her account re-credited

pursuant to the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C.

1693-1693r. Raine, 14 F.3d at 281-82. At the time of its 

failure, the bank had not provisionally re-credited the account

pending final resolution of her request, as required by

regulations implementing the EFTA. Raine contended she was

entitled to deposit insurance on the basis that she should not

suffer because of the bank's mistakes. Id. at 282. However, the 

Fifth Circuit found that

[t]he disputed amount was simply not
credited to her account at all,
conditionally or otherwise. Thus, the
account cannot be covered by deposit
insurance because no credit for the
amounts withdrawn was entered on the
bank's books at the time of failure.

Id. at 283. The court relied on the "well-grounded history" of 

allowing the FDIC to rely exclusively on an insolvent

institution's books and records, even where the bank itself has

-14-

committed a mistake, as well as the policy rationales discussed

above, in upholding the FDIC's use of the books and records. Id. 

According to the court, "[t]he regulations are clear and simple,

either the amount is credited to the account, in which case it is

covered by deposit insurance, or the amount is not on the books,

in which case it becomes a general liability of the bank." Id. 

at 284.

The Commissioner offers no authority contradicting our

analysis of the FDIC regulations, policy considerations, and case

law supporting the use of the failed bank's records. Instead,

the Commissioner counters with two arguments. First, he

contends that even if the FDIC relied on Girod's existing records

at the time of its failure in 1984, it should have concluded that

the Certificate had not been properly cancelled. The

Commissioner relies on 7 L.P.R.A. 3 (1981), which states, in

pertinent part, that 

[t]he term "deposit certificate" shall
mean any deposit which has been evidenced
by a receipt or written agreement
containing the term for which such
deposit has been made and which also
requires presentation at the bank for its 
collection. 

(emphasis added). He concludes from this language that since

Puerto Rico law mandates that the original of a certificate of

deposit be presented to the bank for collection, an FDIC official

reviewing Girod's records regarding the CD's "cancellation" had

to be alerted that the Certificate was still valid by the simple

fact that the original was not contained in the customer profile.

-15-

By failing to do so, the Commissioner contends, the FDIC did not

give the proper weight to these Puerto Rican recordkeeping

requirements.

We do not find this argument convincing. On its face,

the statute sets out the requirements for presentation for

collection, which is not at issue here. We are concerned with

what records should remain in the bank after a setoff, and the

language is silent on this point. The sole case the Commissioner

cites to support its argument that the statute should be read to

require that the original of a certificate must be presented for

setoff, Walla Corp. v. Banco Commercial de Mayaguez, 114 D.P.R. 

216 (1983) (holding that where bank set off loan with

certificates effectively assigned to third party, bank could

compensate the CDs with the loans debtor had with it), does not

mention the statute. We could find no case law on point. Given

the plain meaning of the statute, and the absence of evidence to

support the Commissioner's reading of the statute, we reject his

position. 

The Commissioner's second argument relies on an

exception to the general rule that the records of a failed Bank

are conclusive. That exception states that "records that would

otherwise be conclusive evidence may be attacked as fraudulent."

Collins, 998 F.2d at 555; see, e.g., Jones v. FDIC, 748 F.2d 

1400, 1405 (10th Cir. 1984); McCloud, 853 F. Supp. at 559. The 

Commissioner argues to this court that there was fraud in the

transaction assigning the Certificate, and therefore he is

-16-

entitled to attack the conclusiveness of Girod's records.

However, we refuse to consider the Commissioner's

argument, since he raises it for the first time on appeal.5 It

is well established that this court will not consider an argument

presented for the first time on appeal. See Clauson v. Smith, 

823 F.2d 660, 666 (1st Cir. 1987) (collecting cases). While

exceptions to this rule exist, they apply only "'in horrendous

cases where a gross miscarriage of justice would occur,'"

Johnston v. Holiday Inns, Inc., 595 F.2d 890, 894 (1st Cir. 1979) 

(quoting Newark Morning Ledger Co. v. United States, 539 F.2d 

929, 932 (3d Cir. 1976)), and this is not such a case. That the

Commissioner's argument involves no new facts, just a new theory,

is irrelevant. See Ondine Shipping Corp. v. Cataldo, 24 F.3d 

353, 355 (1st Cir. 1994) ("This assertion is neither original nor

persuasive.").

Therefore, since we find that under either the
 

5 We note in passing that the Commissioner argues on the basis
of fraud in the transaction underlying the records, since there
is no question that the records themselves were accurate.
However, the cases the Commissioner seeks to rely on in his
argument -- McCloud, Abdulla Fouad, and Collins -- all discuss an 
exemption based on fraud in a bank's recordkeeping. See Collins, 
998 F.2d at 556 (noting that there was "no allegation of fraud"
where the bank's records "accurately reflected payout of $100,000
to the wrong party."); Abdulla Fouad, 898 F.2d at 485-86 
(refusing to extend exception to include proof directed to the
deposit account recording); McCloud, 853 F. Supp. at 560 
(concluding that, where there was evidence that the records of
deposits were altered during the course of fraudulent conduct by
the bank president, "it was arbitrary, capricious and contrary to
law for the agency to consider the customer profile as of the day
of the bank's default as conclusive" (footnote omitted)). Thus
we question whether the Commissioner would have met with success,
even if he had both raised this argument in the court below and
demonstrated that there was fraud in the transaction.

-17-

arbitrary and capricious standard or a more demanding de novo 

review the FDIC was correct in relying solely on Girod's records,

and reject the Commissioner's arguments based on Puerto Rico

banking law and fraud, we affirm the district court's holding on

these issues.

C. Application of the McCarran-Ferguson Act C. Application of the McCarran-Ferguson Act 

The Commissioner raises one final argument against the

FDIC's insurance determinations, based on Section 2(b) of the

McCarran-Ferguson Act. 59 Stat. 33, 34 (1945), as amended, 15

U.S.C. 1012(b). Section 2(b) states, in pertinent part:

No Act of Congress shall be construed to
invalidate, impair, or supersede any law
enacted by any State for the purpose of
regulating the business of insurance, or
which imposes a fee or tax upon such
business, unless such Act specifically
relates to the business of insurance
. . . .

15 U.S.C. 1012(b) (1994). This statute creates "a form of

inverse preemption, letting state law prevail over general

federal rules--those that do not 'specifically relate[] to the

business of insurance.'" NAACP v. American Family Mut. Ins. Co., 

978 F.2d 287, 293 (7th Cir. 1992), cert. denied, U.S. , 

113 S. Ct. 2335, 124 L.Ed.2d 247 (1993); see United States Dep't 

of the Treasury v. Fabe, U.S. , , 113 S. Ct. 2202, 

2211, 124 L.Ed.2d 449 (1993) (noting that the Act "transformed

the legal landscape by overturning the normal rules of

preemption."). As the Supreme Court has explained, "'Congress'

purpose was broadly to give support to the existing and future

state systems for regulating and taxing the business of

-18-

insurance.'" Fabe, 113 S. Ct. at 2207 (quoting Prudential Ins. 

Co. v. Benjamin, 328 U.S. 408, 429 (1946)). Indeed, the quoted 

language of Section 2(b) "impos[es] what is, in effect, a clear-

statement rule, a rule that state laws enacted 'for the purpose

of regulating the business of insurance' do not yield to

conflicting federal statutes unless a federal statute

specifically requires otherwise." Id. at 2211. 

The Commissioner seizes on Section 2(b) to contend that

the district court's decision "renders meaningless" the Puerto

Rico Insurance Code provisions requiring that insurance companies

make statutory deposits. See 26 L.P.R.A. 801-809. Because 

Guaranty assigned the CD to the Commissioner in order to comply

with this statute, the Commissioner concludes that the district

court's decision upholding the FDIC's refusal of deposit

insurance impairs the Commissioner's ability to regulate the

business of insurance in Puerto Rico, and therefore violates

Section 2(b). The decision, the Commissioner contends,

particularly impairs "obtaining eligible deposits from insurance

companies to comply with the statutory deposit requirement of the

Insurance Code, whose ultimate aim is to protect policyholders in

case of the insurer's insolvency." (Appellant's Brief, at 20).

The Supreme Court has set out the factors required for

a federal statute to fall within the McCarran-Ferguson Act.

First, the federal statute must "invalidate, impair, or

supersede" the state act. Second, the federal statute must not

"specifically relat[e] to the business of insurance." Finally,

-19-

the state law must have been enacted "for the purpose of

regulating the business of insurance." Fabe, 113 S. Ct. at 2208. 

We need go no further than the first factor in our analysis, as

the Commissioner's argument that the application of the Puerto

Rico Insurance Code is impaired fails.

The Supreme Court faced the question of when an

"impairment" occurs in SEC v. National Sec., Inc., 393 U.S. 453 

(1969). In that case, the SEC sought to unwind the merger of two

insurance companies which had been approved by the state of

Arizona, on the basis that the merger was obtained through use of

fraudulent misrepresentations. Arizona argued that the SEC's

action would violate the McCarran-Ferguson Act. The Supreme

Court, finding that the essential question was "whether the

McCarran-Ferguson Act bars a federal remedy which affects a

matter subject to state insurance regulation," id. at 462, 

disagreed. 

The gravamen of the complaint was the
misrepresentation, not the merger. . . .
Nevertheless, [the state] contend[s] that
any attempt to interfere with a merger
approved by state insurance officials
would "invalidate, impair, or supersede"
the state insurance laws . . . . We
cannot accept this overly broad
restriction on federal power.
It is clear that any "impairment" in
this case is a most indirect one.

Id. at 462-63. The courts have relied on this logic to conclude 

that "application of a federal law [will] be precluded only

where the federal law expressly prohibit[s] acts permitted by

state law, or vice versa." Merchants Home Delivery Serv., Inc. 

-20-

v. Frank B. Hall & Co., 50 F.3d 1486, 1492 (9th Cir. 1995) 

(holding that application of a federal law which prohibited acts

also prohibited by state insurance law did not invalidate,

impair, or supersede state law, despite their differing

remedies), cert. denied sub nom., Prometheus Funding Corp. v. 

Merchants Home Delivery Serv., Inc., U.S. , 116 S. Ct. 

418, L.Ed.2d (1995); see American Family Mut. Ins. Co., 

978 F.2d at 296-97 (drawing on analogies to the principles

governing federal preemption of state law). 

Application of this "direct conflict" test quickly

defeats the Commissioner's argument. In short, nothing in the

district court opinion -- or the FDIC regulations -- impairs the

Commissioner's authority or ability to obtain deposits from

insurance companies to comply with the statutory deposit

requirement. The opinion and regulations merely set out what

records the FDIC may rely on in making insurance determinations.

The Commissioner's loss is the product of events, not a conflict

between federal and Commonwealth statutes. In the absence of a

direct prohibition, we refuse to hold that there has been an

impairment merely because in this circumstance a CD assigned to

the Commissioner was set off against the insurance company's

indebtedness. Cf. Merchants Home Delivery, 50 F.3d at 1492 ("The 

language of 2(b) is inconsistent with a congressional intent to

allow states to preempt the field of insurance regulation."). 

CONCLUSION CONCLUSION

For the reasons stated above, we affirm. affirm. 

-21-